# ADAIR *v.* UNITED STATES.

## ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF KENTUCKY.

No. 293.    Argued October 29, 30, 1907.—Decided January 27, 1908.

It is not within the power of Congress to make it a criminal offense against the United States for a carrier engaged in interstate commerce, or an agent or officer thereof, to discharge an employé simply because of his membership in a labor organization; and the provision to that effect in § 10 of the act of June 1, 1898, 30 Stat. 424, concerning interstate carriers is an invasion of personal liberty, as well as of the right of property, guaranteed by the Fifth Amendment to the Constitution of the United States, and is therefore unenforceable as repugnant to the declaration of that amendment that no person shall be deprived of liberty or property without due process of law.

While the rights of liberty and property guaranteed by the Constitution against deprivation without due process of law, are subject to such reasonable restrictions as the common good or general welfare may require, it is not within the functions of government—at least in the absence of contract—to compel any person in the course of his business, and against his will, either to employ, or be employed by, another. An employer has the same right to prescribe terms on which he will employ one to labor as an employé has to prescribe those on which he will sell his labor, and any legislation which disturbs this equality is an arbitrary and unjustifiable interference with liberty of contract.

*Quære,* and not decided, whether it is within the power of Congress to make it a criminal offense against the United States for either an employer engaged in interstate commerce, or his employé, to disregard, without sufficient notice or excuse, the terms of a valid labor contract.

The power to regulate interstate commerce is the power to prescribe rules by which such commerce must be governed, but the rules prescribed must have a real and substantial relation to, or connection with, the commerce regulated, and as that relation does not exist between the membership of an employé in a labor organization and the interstate commerce with which he is connected, the provision above referred to in § 10 of the act of June 1, 1898 cannot be sustained as a regulation of interstate commerce and as such within the competency of Congress.

The power to regulate interstate commerce, while great and paramount, cannot be exerted in violation of any fundamental right secured by other provisions of the National Constitution.

The provision above referred to, in § 10 of the act of June 1, 1898, is severable, and its unconstitutionality may not affect other provisions of the act or provisions of that section thereof.

THE facts, which involve the constitutionality of § 10 of the act of Congress, concerning carriers engaged in interstate commerce (known as the Erdman Act), passed June 1, 1898, c. 370, 30 Stat. 424, are stated in the opinion.

*Mr. Benjamin D. Warfield,* with whom *Mr. Henry L. Stone* was on the brief, for plaintiff in error:

Section 10 is unconstitutional. If it affects commerce at all, it does so only obliquely, remotely, indirectly and collaterally. A regulation of commerce to come within the meaning of the commerce clause of the Constitution, must be direct and substantial, and not merely indirect, remote, incident and collateral. Therefore § 10 was beyond the power of Congress to enact. *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Hopkins* v. *United States,* 171 U. S. 578; *United States* v. *E. C. Knight Co.,* 156 U. S. 1; *Hooper* v. *California,* 105 U. S. 648, 654; *Williams* v. *Fears,* 179 U. S. 270, 278; *Munn* v. *Illinois,* 94 U. S. 113; *Mugler* v. *Kansas,* 123 U. S. 623, 661. See also *L. & N. R. Co.* v. *Kentucky,* 161 U. S. 677; *Smith* v. *Alabama,* 124 U. S. 465; *Sherlock* v. *Alling,* 93 U. S. 102; *L. S. & M. S. R. R. Co.* v. *Smith,* 173 U. S. 684.

The act under consideration does not prescribe any rule as to traffic or transportation. No rule whatever is laid down. There are no regulations to which the carrier is required to conform, or failing in obedience to which it is to be rendered liable in a civil or a criminal forum. The act is a bold attempt to regulate an ordinary relation of life—of master and servant—one hitherto supposed to be entirely within state control.

Section 10 violates the Fifth Amendment. It impairs, if it does not in fact destroy, the valuable property right of contract. Similar state statutes have been declared unconstitutional. *State* v. *Julow,* 31 S. W. Rep. 781; *Gillespie* v. *People,* 58 N. E. Rep. 1007; *State ex rel. Zillmer* v. *Kreutzberg,* 90

N. W. Rep. 1098; *People* v. *Marcus,* 77 N. E. Rep. 1073; *Wallace* v. *Georgia C. & N. Ry. Co.,* 22 S. E. Rep. 579; *New York &c. R. Co.* v. *Shaffer,* 62 N. E. Rep. 1036. See also *Shaver* v. *Pennsylvania Co.,* 71 Fed. Rep. 931; *Brewster* v. *Miller's Sons & Co.,* 101 Kentucky, 358; *Hundley* v. *L. & N. R. Co.,* 105 Kentucky, 162; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Arthur* v. *Oakes,* 63 Fed. Rep. 310.

Section 10 is unconstitutional as class legislation. The classification is unreasonable. The statute attempts to confer privileges upon union labor that are not conferred upon non-union labor. No restraint whatever is imposed upon carriers with respect to discharging or discriminating against non-union laborers. However lawful it may be for employés to organize and become members of labor unions or associations, under our form of government, which guarantees equal privileges to all before the law, it is not competent for Congress, or state legislatures, to make such an unreasonable classification as in the statute before us, whereby union labor is preferred as against non-union labor. *Johnson* v. *Ry. Co.,* 43 Minnesota, 223; *S. C.,* 8 L. R. A. 419; *Gulf, Col. & Santa Fé Ry. Co.* v. *Ellis,* 165 U. S. 150; *Robertson* v. *Baldwin,* 165 U. S. 275.

*The Attorney General* and *Mr. William R. Harr,* Special Assistant to the Attorney General, for defendant in error:

Section 10 of the act has a clear and direct relation to interstate commerce. Its constitutionality is not to be determined by considering it separately from the other provisions of the act, as was done by Judge Evans in *United States* v. *Scott,* 148 Fed. Rep. 431. Considered in the light of the other provisions of the act and the purpose which pervades the entire statute, the relation of § 10 to interstate commerce is at once apparent. In construing statutes the whole statute and all of its parts are to be taken together. *Pennington* v. *Coxe,* 2 Cranch, 34.

The manifest purpose of the act is the protection of interstate and foreign commerce by the avoidance of strikes, lockouts, etc., which are the forms such interruptions usually assume.

The history of the act removes any doubt on this point. It was the result of the great railroad strike at Chicago in June–July, 1894. See Senate Rep. 591, 55th Cong., 2d Session; H. Rep. 454, 55th Cong., 2d Session.

It recognized the fact that such interruptions were not apt to assume serious proportions unless the employés were members of labor organizations and the latter became involved in it. Congress also recognized the fact that discrimination against employés because of their membership in a labor organization was calculated to bring on such disturbances. For the purpose, therefore, of preventing these interruptions, it provided means for the arbitration of disputes between the carriers and their employés through the labor organizations to which the latter belonged, and forbade discrimination against employés because of their membership in such organizations.

The relation of the inhibitions in § 10 to the general scheme for the protection of interstate commerce embodied in the act against interruption by strikes, lockouts, etc., is therefore apparent. Congress has the constitutional authority so to regulate the business of a common carrier engaged in interstate commerce as adequately to protect and safeguard the interests of such commerce.

The right of individuals or corporations to make contracts and do business is at all times subservient to the power of Congress to regulate interstate commerce, and common carriers are subject to greater control than private individuals by the State or Congress (according as their business is local or interstate), on account of the public nature of such business. See *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290; *United States* v. *Joint Traffic Association*, 171 U. S. 505; *Addyston Pipe and Steel Co.* v. *United States*, 175 U. S. 211; *United States* v. *Northern Securities Co.*, 193 U. S. 197; *United States* v. *Swift & Co.*, 196 U. S. 375.

When the business of the carrier is interstate, the power of the State to control the conduct of its business in the interest of the public health, safety or convenience is subject to the

paramount right of Congress over the subject, which may displace all state regulations by legislation of its own. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Nashville &c. Ry.* v. *Alabama*, 128 U. S. 96; *Hennington* v. *Georgia*, 163 U. S. 299, 317; *New York, New Haven & Hartford Ry. Co.* v. *New York*, 165 U. S. 628, 631; *Reid* v. *Colorado*, 187 U. S. 137. See also *Granger Cases*, 94 U. S. 113; *Wabash, St. Louis & Pacific Ry. Co.* v. *Illinois*, 118 U. S. 557; *B. & O. R. R. Co.* v. *Baugh*, 149 U. S. 368.

Although the Supreme Court has held that the act to regulate commerce did not confer upon the Interstate Commerce Commission the power to fix rates, *Cincinnati &c. Railway* v. *Interstate Comm. Comm.*, 162 U. S. 184; *Interstate Comm. Comm.* v. *Cincinnati &c. Railway*, 167 U. S. 479, in so doing it plainly recognized the plenary authority of Congress over the matter. See *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1, construing the safety-appliance act of March 2, 1893, and showing that Congress may change the common law rules of liability between master and servant in respect to common carriers engaged in interstate commerce; and may also legislate for the protection of employés of such common carriers.

The cases above referred to simply extend to interstate commerce by land the principles theretofore enumerated by the Supreme Court in reference to interstate commerce by water. Prior to the construction of railroads the plenary power of Congress over the navigable waters of the United States and the agencies and instrumentalities of interstate commerce thereon had been firmly established, and later cases confirm its power in that regard. *Gibbons* v. *Ogden*, 9 Wheat. 1; *United States* v. *Coombs*, 12 Pet. 72; *Waring* v. *Clarke*, 5 How. 441; *Sinnot* v. *Davenport*, 22 How. 240; *Gilman* v. *Philadelphia*, 3 Wall. 713; *The Daniel Ball*, 10 Wall. 557; *Bridge Co.* v. *United States*, 105 U. S. 470; *Escanaba Company* v. *Chicago*, 107 U. S. 678; *Williamette Iron Bridge Co.* v. *Hatch*, 125 U. S. 1; *United States* v. *Bellingham Bay Boom Co.*, 176 U. S. 211.

These cases affirm the right of Congress to license, inspect and control vessels engaged in interstate commerce upon the navigable waters of the United States, and to exercise exclusive control over such highways in the interest of commerce and regulation thereon.

There is no invasion of the carrier's liberty by this statute. Congress has the right to control common carriers engaged in interstate commerce in the matter of the selection of their employés so far as it may be necessary for the protection of such commerce and the persons engaged in it, whether as shippers, passengers or employés.

Counsel rely on certain decisions, holding that a State had no authority to enact legislation forbidding discrimination by employers against members of labor organizations. *Gillespie* v. *The People*, 188 Illinois, 176; *State* v. *Julow*, 129 Missouri, 163; *State* v. *Kreutzerberg* (Wisconsin), 90 N. W. Rep. 1098.

The correctness of these decisions may be doubted. Such statutes do not deprive the employer of any lawful right. They simply protect the rights of the employés against invasion by the employer. The alleged right of the employer is a right to interfere with the liberty of his employés because they are in his service. See *Davis* v. *State*, 30 Ohio L. J. 342; 11 Ohio Dec. Reprint, 894.

The courts have nothing to do with the policy of legislation, the only question for them being as to the power of Congress over the subject. *United States* v. *Joint Traffic Association*, 171 U. S. 505. This statute does not come under the exception intimated in that case in the case of "a possible gross perversion of the principle" that Congress was the judge of the necessity and propriety of legislation for the proper protection of interstate commerce. *Lochner* v. *New York*, 198 U. S. 45, discussed and distinguished.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case involves the constitutionality of certain provisions of the act of Congress of June 1, 1898, 30 Stat. 424, c. 370,—

concerning carriers engaged in interstate commerce and their employés.

By the first section of the act it is provided: "That the provisions of this act shall apply to any common carrier or carriers and their officers, agents, and employés, except masters of vessels and seamen, as defined in section 4612, Revised Statutes of the United States, engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water, for a continuous carriage or shipment, from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States. The term 'railroad' as used in this act shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement or lease; and the term 'transportation' shall include all instrumentalities of shipment or carriage. The term 'employés' as used in this act shall include all persons actually engaged in any capacity in train operation or train service of any description, and notwithstanding that the cars pon or in which they are employed may be held and operated by the carrier under lease or other contract: Provided, however, That this act shall not be held to apply to employés of street railroads and shall apply only to employés engaged in railroad train service. In every such case the carrier shall be responsible for the acts and defaults of such employés in the same manner and to the same extent as if said cars were owned by it and said employés directly employed by it, and any provisions to the contrary of any such lease or other contract shall be binding only as between the parties thereto and shall not affect the obligations of said carrier either to the public or to the private parties concerned."

The 2d, 3d, 4th, 5th, 6th, 7th, 8th and 9th sections relate to the settlement, by means of arbitration, of controversies concerning wages, hours of labor, or conditions of employment arising between a carrier subject to the provisions of the act and its employés, which seriously interrupt or threaten to interrupt the business of the carrier. Those sections prescribe the mode in which controversies may be brought under the cognizance of arbitrators, in what way the arbitrators may be designated, and the effect of their decisions. The first subdivision of § 3 contains a proviso, "that no employé shall be compelled to render personal service without his consent."

The 11th section relates to the compensation and expenses of the arbitrators.

By the 12th section the act of Congress of October 1, 1888, 25 Stat. 501, c. 1063, creating boards of arbitrators or commissioners for settling controversies and differences between railroad corporations and other common carriers engaged in interstate or territorial transportation of persons or property and their employés, was repealed.

The 10th section, upon which the present prosecution is based, is in these words:

"That any employer subject to the provisions of this act and any officer, agent, or receiver of such employer, who shall require any employé, or any person seeking employment, as a condition of such employment, to enter into an agreement, either written or verbal, not to become or remain a member of any labor corporation, association, or organization; *or shall threaten any employé with loss of employment, or shall unjustly discriminate against any employé because of his membership in such a labor corporation, association, or organization;* or who shall require any employé or any person seeking employment, as a condition of such employment, to enter into a contract whereby such employé or applicant for employment shall agree to contribute to any fund for charitable, social, or beneficial purposes; to release such employer from legal liability for any personal injury by reason of any benefit received from

such fund beyond the proportion of the benefit arising from the employer's contribution to such fund; or who shall, after having discharged an employé, attempt or conspire to prevent such employé from obtaining employment, or who shall, after the quitting of an employé, attempt or conspire to prevent such employé from obtaining employment, is hereby declared to be guilty of a misdemeanor, and, upon conviction thereof in any court of the United States of competent jurisdiction in the district in which such offense was committed, shall be punished for each offense by a fine of not less than one hundred dollars and not more than one thousand dollars."

It may be observed in passing that while that section makes it a crime against the United States to unjustly discriminate against an employé of an interstate carrier because of his being a member of a labor organization, it does not make it a crime to unjustly discriminate against an employé of the carrier because of his *not* being a member of such an organization.

The present indictment was in the District Court of the United States for the Eastern District of Kentucky against the defendant Adair.

The first count alleged "that at and before the time hereinafter named the Louisville and Nashville Railroad Company is and was a railroad corporation, duly organized and existing by law and a common carrier engaged in the transportation of passengers and property wholly by steam railroad for a continuous carriage and shipment from one State of the United States to another State of the United States of America, that is to say, from the State of Kentucky into the States of Ohio, Indiana and Tennessee, and from the State of Ohio into the State of Kentucky, and was at all times aforesaid and at the time of the commission of the offense hereinafter named, a common carrier of interstate commerce, and an employer, subject to the provisions of a certain act of Congress of the United States of America, entitled, 'An Act concerning carriers engaged in interstate commerce and their employés,' approved June 1, 1898, and said corporation was not at any

time a street railroad corporation. That before and at the time of the commission of the offense hereinafter named one William Adair was an agent and employé of said common carrier and employer, and was at all said times master mechanic of said common carrier and employer in the district aforesaid; and before and at the time hereinafter stated one O. B. Coppage was an employé of said common carrier and employer in the district aforesaid, and as such employé was at all times hereinafter named actually engaged in the capacity of locomotive fireman in train operation and train service for said common carrier and employer in the transportation of passengers and property aforesaid, and was an employé of said common carrier and employer actually engaged in said railroad transportation and train service aforesaid, to whom the provisions of said act applied, and at the time of the commission of the offense hereinafter named said O. B. Coppage was a member of a certain labor organization, known as the Order of Locomotive Firemen, as he the said William Adair then and there well knew, a more particular description of said organization and the members thereof is to the grand jurors unknown."

The specific charge in that count was "that said William Adair, agent and employé of said common carrier and employer as aforesaid, in the district aforesaid, on and before the 15th day of October, 1906, did unlawfully and unjustly discriminate against said O. B. Coppage, employé as aforesaid, by then and there discharging said O. B. Coppage from such employment of said common carrier and employer, *because of his membership in said labor organization, and thereby did unjustly discriminate against an employé of a common carrier and employer engaged in interstate commerce because of his membership in a labor organization*, contrary to the forms of the statute in such cases made and provided, and against the peace and dignity of the United States."

The second count repeated the general allegations of the first count as to the character of the business of the Louisville

and Nashville Railroad Company and the relations between that corporation and Adair and Coppage. It charged "that said William Adair, in the district aforesaid and within the jurisdiction of this court, agent and employé of said common carrier and employer aforesaid, on and before the 15th day of October, 1906, did unlawfully *threaten said O. B. Coppage, employé as aforesaid, with loss of employment, because of his membership in said labor organization,* contrary to the forms of the statute in such cases made and provided, and against the peace and dignity of the United States."

The accused Adair demurred to the indictment as insufficient in law, but the demurrer was overruled. After reviewing the authorities, in an elaborate opinion, the court held the tenth section of the act of Congress to be constitutional. 152 Fed. Rep. 737. The defendant pleaded not guilty, and after trial a verdict was returned of guilty on the first count and a judgment rendered that he pay to the United States a fine of $100. We shall, therefore, say nothing as to the second count of the indictment.

It thus appears that the criminal offense charged in the count of the indictment upon which the defendant was convicted was, in substance and effect, that being an agent of a railroad company engaged in interstate commerce and subject to the provisions of the above act of June 1, 1898, he discharged one Coppage from its service *because of his membership in a labor organization*—no other ground for such discharge being alleged.

May Congress make it a criminal offense against the United States—as by the tenth section of the act of 1898 it does—for an agent or officer of an interstate carrier, having full authority in the premises from the carrier, to discharge an employé from service simply because of his membership in a labor organization?

This question is admittedly one of importance, and has been examined with care and deliberation. And the court has reached a conclusion which, in its judgment, is consistent

with both the words and spirit of the Constitution and is sustained as well by sound reason.

The first inquiry is whether the part of the tenth section of the act of 1898 upon which the first count of the indictment was based is repugnant to the Fifth Amendment of the Constitution declaring that no person shall be deprived of liberty or property without due process of law. In our opinion that section, in the particular mentioned, is an invasion of the personal liberty, as well as of the right of property, guaranteed by that Amendment. Such liberty and right embraces the right to make contracts for the purchase of the labor of others and equally the right to make contracts for the sale of one's own labor; each right, however, being subject to the fundamental condition that no contract, whatever its subject matter, can be sustained which the law, upon reasonable grounds, forbids as inconsistent with the public interests or as hurtful to the public order or as detrimental to the common good. This court has said that "in every well-ordered society, charged with the duty of conserving the safety of its members, the rights of the individual in respect of his liberty may, at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson* v. *Massachusetts*, 197 U. S. 11, 29, and authorities there cited. Without stopping to consider what would have been the rights of the railroad company under the Fifth Amendment, had it been indicted under the act of Congress, it is sufficient in this case to say that as agent of the railroad company and as such responsible for the conduct of the business of one of its departments, it was the defendant Adair's right—and that right inhered in his personal liberty, and was also a right of property—to serve his employer as best he could, so long as he did nothing that was reasonably forbidden by law as injurious to the public interests. It was the right of the defendant to prescribe the terms upon which the services of Coppage would be accepted, and it was the right of Coppage to become or not,

as he chose, an employé of the railroad company upon the terms offered to him. Mr. Cooley, in his treatise on Torts, p. 278, well says: "It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with any one with whom he can make contracts, and if he is wrongfully deprived of this right by others, he is entitled to redress."

In *Lochner* v. *New York*, 198 U. S. 45, 53, 56, which involved the validity of a state enactment prescribing certain maximum hours for labor in bakeries, and which made it a misdemeanor for an employer to require or permit an employé in such an establishment to work in excess of a given number of hours each day, the court said: "The general right to make a contract in relation to his business is part of the liberty of the individual protected by the Fourteenth Amendment of the Federal Constitution. *Allgeyer* v. *Louisiana*, 165 U. S. 578. Under that provision no State can deprive any person of life, liberty or property without due process of law. The right to purchase or to sell labor is part of the liberty protected by this amendment, unless there are circumstances which exclude the right. There are, however, certain powers, existing in the sovereignty of each State in the Union, somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals and general welfare of the public. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the State in the exercise of those powers, and with such conditions the Fourteenth Amendment was not designed to interfere. *Mugler* v. *Kansas*, 123 U. S. 623; *In re Kemmler*, 136 U. S. 436; *Crowley* v. *Christensen*, 137 U. S. 86; *In re Converse*, 137 U. S. 624. . . . In every case that

comes before this court, therefore, where legislation of this character is concerned and where the protection of the Federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable and appropriate exercise of the police power of the State, or is it an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts in relation to labor which may seem to him appropriate or necessary for the support of himself and his family? Of course the liberty of contract relating to labor includes both parties to it. The one has as much right to purchase as the other to sell labor." Although there was a difference of opinion in that case among the members of the court as to certain propositions, there was no disagreement as to the general proposition that there is a liberty of contract which cannot be unreasonably interfered with by legislation. The minority were of opinion that the business referred to in the New York statute was such as to require regulation, and that as the statute was not shown plainly and palpably to have imposed an unreasonable restraint upon freedom of contract, it should be regarded by the courts as a valid exercise of the State's power to care for the health and safety of its people.

While, as already suggested, the rights of liberty and property guaranteed by the Constitution against deprivation without due process of law, is subject to such reasonable restraints as the common good or the general welfare may require, it is not within the functions of government—at least in the absence of contract between the parties—to compel any person in the course of his business and against his will to accept or retain the personal services of another, or to compel any person, against his will, to perform personal services for another. The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. So the right of the employé to quit the service of the employer,

for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employé. It was the legal right of the defendant Adair—however unwise such a course might have been—to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so —however unwise such a course on his part might have been—to quit the service in which he was engaged, because the defendant employed some persons who were not members of a labor organization. In all such particulars the employer and the employé have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land. These views find support in adjudged cases, some of which are cited in the margin.[1] Of course, if the parties by contract fix the period of service, and prescribe the conditions upon which the contract may be terminated, such contract would control the rights of the parties as between themselves, and for any violation of those provisions the party wronged would have his appropriate civil action. And it may be—but upon that point we express no opinion—that in the case of a labor contract between an employer engaged in interstate commerce and his employé, Congress could make it a crime for either party without sufficient or just excuse or notice to disregard the terms of such contract or to refuse to perform it. In the absence, however, of a valid contract between the parties controlling their conduct towards each other and fixing a period of service, it cannot be, we repeat, that an employer is under any legal obligation, against his will, to retain an employé in his personal service any more than an employé

---

[1] *People* v. *Marcus*, 185 N. Y. 257; *National Protection Assn.* v. *Cummings*, 170 N. Y. 315; *Jacobs* v. *Cohen*, 183 N. Y. 207; *State* v. *Julow*, 129 Missouri, 163; *State* v. *Goodwill*, 33 W. Va. 179; *Gillespie* v. *People*, 188 Illinois, 176; *State* v. *Kreutzberg*, 114 Wisconsin, 530; *Wallace* v. *Georgia, C. & N. Ry. Co.*, 94 Georgia, 732; *Hundley* v. *L. & N. R. R. Co.*, 105 Kentucky, 162; *Brewster* v. *Miller's Sons & Co.*, 101 Kentucky, 268; *N. Y. &c. R. R. Co.* v. *Schaffer*, 65 Ohio St. 414; *Arthur* v. *Oakes*, 63 Fed. Rep. 310.

can be compelled, against his will, to remain in the personal service of another. So far as this record discloses the facts the defendant, who seemed to have authority in the premises, did not agree to keep Coppage in service for any particular time, nor did Coppage agree to remain in such service a moment longer than he chose. The latter was at liberty to quit the service without assigning any reason for his leaving. And the defendant was at liberty, in his discretion, to discharge Coppage from service without giving any reason for so doing.

As the relations and the conduct of the parties towards each other was not controlled by any contract other than a general agreement on one side to accept the services of the employé and a general agreement on the other side to render services to the employer—no term being fixed for the continuance of the employment—Congress could not, consistently with the Fifth Amendment, make it a crime against the United States to discharge the employé because of his being a member of a labor organization.

But it is suggested that the authority to make it a crime for an agent or officer of an interstate carrier, having authority in the premises from his principal, to discharge an employé from service to such carrier, simply because of his membership in a labor organization, can be referred to the power of Congress to regulate interstate commerce, without regard to any question of personal liberty or right of property arising under the Fifth Amendment. This suggestion can have no bearing in the present discussion unless the statute, in the particular just stated, is within the meaning of the Constitution a regulation of commerce among the States. If it be not, then clearly the Government cannot invoke the commerce clause of the Constitution as sustaining the indictment against Adair.

Let us inquire what is commerce, the power to regulate which is given to Congress?

This question has been frequently propounded in this court, and the answer has been—and no more specific answer could

well have been given—that commerce among the several States comprehends traffic, intercourse, trade, navigation, communication, the transit of persons and the transmission of messages by telegraph—indeed, every species of commercial intercourse among the several States, but not to that commerce "completely internal, which is carried on between man and man, in a State, or between different parts of the same State, and which does not extend to or affect other States." The power to regulate interstate commerce is the power to prescribe rules by which such commerce must be governed.[1] Of course, as has been often said, Congress has a large discretion in the selection or choice of the means to be employed in the regulation of interstate commerce, and such discretion is not to be interfered with except where that which is done is in plain violation of the Constitution. *Northern Securities Co. v. United States,* 193 U. S. 197, and authorities there cited. In this connection we may refer to *Johnson v. Railroad,* 196 U. S. 1, relied on in argument, which case arose under the act of Congress of March 2, 1893, 27 Stat. 531, c. 196. That act required carriers engaged in interstate commerce to equip their cars used in such commerce with automatic couplers and continuous brakes, and their locomotives with driving wheel brakes. But the act upon its face showed that its object was to promote the safety of employés and travelers upon railroads; and this court sustained its validity upon the ground that it manifestly had reference to interstate commerce and was calculated to subserve the interests of such commerce by affording protection to employés and travelers. It was held that there was a substantial connection between the object sought to be attained by the act and the means provided to accomplish that object. So, in regard to *Employers' Liabil-*

[1] *Gibbons v. Ogden,* 9 Wheat. 1; *Passenger Cases,* 7 How. 283; *Almy v. State of California,* 24 How. 169; *Pensacola Tel. Co. v. Western Union Tel. Co.,* 96 U. S. 1, 9, 12; *County of Mobile v. Kimball,* 102 U. S. 691; *Western Union Tel. Co. v. Pendleton,* 122 U. S. 347, 356; *Lottery Case,* 188 U. S. 321, 352; *Northern Securities Co. v. United States,* 193 U. S. 197; *Employers' Liability Cases,* 207 U. S. 463.

*ity Cases*, 207 U. S. 463, decided at the present term. In
that case the court sustained the authority of Congress, under
its power to regulate interstate commerce, to prescribe the
rule of liability, as between interstate carriers and its em-
ployés in such interstate commerce, in cases of personal in-
juries received by employés while actually engaged in such
commerce. The decision on this point was placed on the
ground that a rule of that character would have direct ref-
erence to the conduct of interstate commerce, and would,
therefore, be within the competency of Congress to establish
for commerce among the States, but not as to commerce
completely internal to a State. Manifestly, any rule prescribed
for the conduct of interstate commerce, in order to be within
the competency of Congress under its power to regulate com-
merce among the States, must have some real or substantial
relation to or connection with the commerce regulated. But
what possible legal or logical connection is there between an
employé's membership in a labor organization and the carry-
ing on of interstate commerce? Such relation to a labor
organization cannot have, *in itself* and in the eye of the law,
any bearing upon the commerce with which the employé is
connected by his labor and services. Labor associations, we
assume, are organized for the general purpose of improving
or bettering the conditions and conserving the interests of its
members as wage-earners—an object entirely legitimate and
to be commended rather than condemned. But surely those
associations as labor organizations have nothing to do with
interstate commerce as such. One who engages in the service
of an interstate carrier will, it must be assumed, faithfully
perform his duty, whether he be a member or not a member
of a labor organization. His fitness for the position in which
he labors and his diligence in the discharge of his duties cannot
in law or sound reason depend in any degree upon his being
or not being a member of a labor organization. It cannot be
assumed that his fitness is assured, or his diligence increased,
by such membership, or that he is less fit or less diligent be-

cause of his not being a member of such an organization. It is the employé as a man and not as a member of a labor organization who labors in the service of an interstate carrier. Will it be said that the provision in question had its origin in the apprehension, on the part of Congress, that if it did not show more consideration for members of labor organizations than for wage-earners who were not members of such organizations, or if it did not insert in the statute some such provision as the one here in question, members of labor organizations would, by illegal or violent measures, interrupt or impair the freedom of commerce among the States? We will not indulge in any such conjectures, nor make them, in whole or in part, the basis of our decision. We could not do so consistently with the respect due to a coördinate department of the Government. We could not do so without imputing to Congress the purpose to accord to one class of wage-earners privileges withheld from another class of wage-earners engaged, it may be, in the same kind of labor and serving the same employer. Nor will we assume, in our consideration of this case, that members of labor organizations will, in any considerable numbers, resort to illegal methods for accomplishing any particular object they have in view.

Looking alone at the words of the statute for the purpose of ascertaining its scope and effect, and of determining its validity, we hold that there is no such connection between interstate commerce and membership in a labor organization as to authorize Congress to make it a crime against the United States for an agent of an interstate carrier to discharge an employé because of such membership on his part. If such a power exists in Congress it is difficult to perceive why it might not, by absolute regulation, require interstate carriers, under penalties. to employ in the conduct of its interstate business *only* members of labor organizations, or *only* those who are *not* members of such organizations—a power which could not be recognized as existing under the Constitution of the United States. No such rule of criminal liability as that to which

we have referred can be regarded as, in any just sense, a regulation of interstate commerce. We need scarcely repeat what this court has more than once said, that the power to regulate interstate commerce, great and paramount as that power is, cannot be exerted in violation of any fundamental right secured by other provisions of the Constitution. *Gibbons* v. *Ogden,* 9 Wheat. 1, 196; *Lottery Case,* 188 U. S. 321, 353.

It results, on the whole case, that the provision of the statute under which the defendant was convicted must be held to be repugnant to the Fifth Amendment and as not embraced by nor within the power of Congress to regulate interstate commerce, but under the guise of regulating interstate commerce and as applied to this case it arbitrarily sanctions an illegal invasion of the personal liberty as well as the right of property of the defendant Adair.

We add that since the part of the act of 1898 upon which the first count of the indictment is based, and upon which alone the defendant was convicted, is severable from its other parts, and as what has been said is sufficient to dispose of the present case, we are not called upon to consider other and independent provisions of the act, such, for instance, as the provisions relating to arbitration. This decision is therefore restricted to the question of the validity of the particular provision in the act of Congress making it a crime against the United States for an agent or officer of an interstate carrier to discharge an employé from its service because of his being a member of a labor organization.

The judgment must be reversed, with directions to set aside the verdict and judgment of conviction, sustain the demurrer to the indictment, and dismiss the case.

*It is so ordered.*

MR. JUSTICE MOODY did not participate in the decision of this case.

MR. JUSTICE McKENNA, dissenting.

The opinion of the court proceeds upon somewhat narrow

lines and either omits or does not give adequate prominence
to the considerations which, I think, are determinative of the
questions in the case. The principle upon which the opinion
is grounded is, as I understand it, that a labor organization
has no legal or logical connection with interstate commerce,
and that the fitness of an employé has no dependence or rela-
tion with his membership in such organization. It is hence
concluded that to restrain his discharge merely on account of
such membership is an invasion of the liberty of the carrier
guaranteed by the Fifth Amendment of the Constitution of
the United States. The conclusion is irresistible if the proposi-
tions from which it is deduced may be viewed as abstractly
as the opinion views them. May they be so viewed?

A summary of the act is necessary to understand § 10.
Detach that section from the other provisions of the act and
it might be open to condemnation.

The first section of the act designates the carriers to whom
it shall apply. The second section makes it the duty of the
Chairman of the Interstate Commerce Commission and the
Commissioner of Labor, in case of a dispute between carriers
and their employés which threatens to interrupt the business
of the carriers, to put themselves in communication with the
parties to the controversy and use efforts to "mediation and
conciliation." If the efforts fail, then § 3 provides for the
appointment of a board of arbitration—one to be named
by the carrier, one by the labor organization to which the
employés belong, and the two thus chosen shall select a
third.

There is a provision that if the employés belong to different
organizations they shall concur in the selection of the arbitrator.
The board is to give hearings; power is invested in the board
to summon witnesses, and provision is made for filing the
award in the clerk's office of the Circuit Court of the United
States for the district where the controversy arose. Other
sections complete the scheme of arbitration thus outlined,
and make, as far as possible, the proceedings of the arbitrators

judicial, and pending them put restrictions on the parties and damages for violation of the restrictions.

Even from this meager outline may be perceived the justification and force of § 10. It prohibits discrimination by a carrier engaged in interstate commerce, in the employment under the circumstances hereafter mentioned or the discharge from employment of members of labor organizations "*because of such membership.*" This the opinion condemns. The actions prohibited, it is asserted, are part of the liberty of a carrier protected by the Constitution of the United States from limitation or regulation. I may observe that the declaration is clear and unembarrassed by any material benefit to the carrier from its exercise. It may be exercised with reason or without reason, though the business of the carrier is of public concern. This, then, is the contention, and I bring its elements into bold relief to submit against them what I deem to be stronger considerations, based on the statute and sustained by authority.

I take for granted that the expressions of the opinion of the court, which seem to indicate that the provisions of § 10 are illegal because their violation is made criminal, are used only for description and incidental emphasis, and not as the essential ground of the objections to those provisions.

I may assume at the outset that the liberty guaranteed by the Fifth Amendment is not a liberty free from all restraints and limitations, and this must be so or government could not be beneficially exercised in many cases. Therefore in judging of any legislation which imposes restraints or limitations the inquiry must be, what is their purpose and is the purpose within one of the powers of government? Applying this principle immediately to the present case without beating about in the abstract, the inquiry must be whether § 10 of the act of Congress has relation to the purpose which induced the act and which it was enacted to accomplish, and whether such purpose is in aid of interstate commerce and not a mere restriction upon the liberty of carriers to employ whom they please, or to have business relations with whom they please. In the inquiry there

is necessarily involved a definition of interstate commerce and of what is a regulation of it. As to the first, I may concur with the opinion; as to the second, an immediate and guiding light is afforded by the *Employers' Liability Cases,* recently decided, 207 U. S. 463. In those cases there was a searching scrutiny of the powers of Congress, and it was held to be competent to establish a new rule of liability of the carrier to his employés—in a word, competent to regulate the relation of master and servant, a relation apparently remote from commerce, and one which was earnestly urged by the railroad to be remote from commerce. To the contention the court said: "But we may not test the power of Congress to regulate commerce solely by abstractly considering the broad subject to which a regulation relates, irrespective of whether the regulation in question is one of interstate commerce. On the contrary, the test of power is not merely the matter regulated, but whether the regulation is directly one of interstate commerce or is embraced within the grant conferred on Congress to use all lawful means necessary and appropriate to the execution of that power to regulate commerce." In other words, that the power is not confined to a regulation of the mere movement of goods or persons.

And there are other examples in our decisions—examples, too, of liberty of contract and liberty of forming business relations (made conspicuous as grounds of decision in the present case)—which were compelled to give way to the power of Congress. *Northern Securities Company* v. *United States,* 193 U. S. 197. In that case exactly the same definitions were made as made here and the same contentions were pressed as are pressed here. The Northern Securities Company was not a railroad company. Its corporate powers were limited to buying, selling and holding stock, bonds and other securities, and, it was contended, that as such business was not commerce at all it could not be within the power of Congress to regulate. The contention was not yielded to, though it had the support of members of this court. Asserting the application of the Anti-

Trust Act of 1890 to such business and the power of Congress to regulate it, the court said "that a sound construction of the Constitution allows to Congress a large discretion 'with respect to the means by which the powers it [the commerce clause] confers are to be carried into execution, which enables that body to perform the high duties assigned to it, in the manner most beneficial to the people.'" It was in recognition of this principle that it was declared in *United States* v. *Joint Traffic Association*, 171 U. S. 571: "The prohibition of such contracts [contracts fixing rates] may in the judgment of Congress be one of the reasonable necessities of proper regulation of commerce, and Congress is the *judge* of such necessity and propriety, unless, *in case of a possible gross perversion of the principle*, the courts might be applied to for relief." The contentions of the parties in the case invoked the declaration. There as here an opposition was asserted between the liberty of the railroads to contract with one another and the power of Congress to regulate commerce. That power was pronounced paramount, and it was not perceived, as it seems to be perceived now, that it was subordinate and controlled by the provisions of the Fifth Amendment. Nor was the relation of the power of Congress to that amendment overlooked. It was commented upon and reconciled. And there is nothing whatever in *Gibbons* v. *Ogden*, 9 Wheat. 1, or in *Lottery Case*, 188 U. S. 321, which is to the contrary.

From these considerations we may pass to an inspection of the statute of which § 10 is a part, and inquire as to its purpose, and if the means which it employs has relation to that purpose and to interstate commerce. The provisions of the act are explicit and present a well coördinated plan for the settlement of disputes between carriers and their employés, by bringing the disputes to arbitration and accommodation; and thereby prevent strikes and the public disorder and derangement of business that may be consequent upon them. I submit no worthier purpose can engage legislative attention or be the object of legislative action, and, it might be urged,

to attain which the congressional judgment of means should not be brought under a rigid limitation and condemned, if it contribute in any degree to the end, as a "gross perversion of the principle" of regulation, the condition which, it was said in *United States* v. *Joint Traffic Association, supra,* might justify an appeal to the courts.

We are told that labor associations are to be commended. May not then Congress recognize their existence; yes, and recognize their power as conditions to be counted with in framing its legislation? Of what use would it be to attempt to bring bodies of men to agreement and compromise of controversies if you put out of view the influences which move them or the fellowship which binds them—maybe controls and impels them—whether rightfully or wrongfully, to make the cause of one the cause of all? And this practical wisdom Congress observed—observed, I may say, not in speculation of uncertain provision of evils, but in experience of evils— an experience which approached to the dimensions of a National calamity. The facts of history should not be overlooked, nor the course of legislation. The act involved in the present case was preceded by one enacted in 1888 of similar purport. 25 Stat. 501, c. 1063. That act did not recognize labor associations, or distinguish between the members of such associations and the other employés of carriers. It failed in its purpose, whether from defect in its provisions or other cause we may only conjecture. At any rate, it did not avert the strike at Chicago in 1894. Investigation followed, and, as a result of it, the act of 1898 was finally passed. Presumably its provisions and remedy were addressed to the mischief which the act of 1888 failed to reach or avert. It was the judgment of Congress that the scheme of arbitration might be helped by engaging in it the labor associations. Those associations unified bodies of employés in every department of the carriers, and this unity could be an obstacle or an aid to arbitration. It was attempted to be made an aid, but how could it be made an aid if, pending the efforts of "mediation and conciliation"

of the dispute, as provided in § 2 of the act, other provisions of the act may be arbitrarily disregarded, which are of concern to the members in the dispute? How can it be an aid, how can controversies which may seriously interrupt or threaten to interrupt the business of carriers (I paraphrase the words of the statute), be averted or composed if the carrier can bring on the conflict or prevent its amicable settlement by the exercise of mere whim and caprice? I say mere whim or caprice, for this is the liberty which is attempted to be vindicated as the Constitutional right of the carriers. And it may be exercised in mere whim and caprice. If ability, the qualities of efficient and faithful workmanship can be found outside of labor associations, surely they may be found inside of them. Liberty is an attractive theme, but the liberty which is exercised in sheer antipathy does not plead strongly for recognition.

There is no question here of the right of a carrier to mingle in his service "union" and "non-union" men. If there were, broader considerations might exist. In such a right there would be no discrimination for the "union" and no discrimination against it. The efficiency of an employé would be its impulse and ground of exercise.

I need not stop to conjecture whether Congress could or would limit such right. It is certain that Congress has not done so by any provision of the act under consideration. Its letter, spirit and purpose are decidedly the other way. It imposes, however, a restraint, which should be noticed. The carriers may not require an applicant for employment or an employé to agree not to become or remain a member of a labor organization. But this does not constrain the employment of anybody, be he what he may.

But it is said it cannot be supposed that labor organizations will, "by illegal or violent measures, interrupt or impair the freedom of commerce," and to so suppose would be disrespect to a coördinate branch of the Government and to impute to it a purpose "to accord to one class of wage-earners privileges withheld from another class of wage-earners engaged, it may

be, in the same kind of labor and serving the same employer."
Neither the supposition nor the disrespect is necessary, and, it
may be urged, they are no more invidious than to impute to
Congress a careless or deliberate or purposeless violation of
the Constitutional rights of the carriers. Besides, the legisla-
tion is to be accounted for. It, by its letter, makes a difference
between members of labor organizations and other employés
of carriers. If it did not, it would not be here for review.
What did Congress mean? Had it no purpose? Was it moved
by no cause? Was its legislation mere wantonness and an
aimless meddling with the commerce of the country? These
questions may find their answers in *In re Debs*, 158 U. S. 564.

I have said that it is not necessary to suppose that labor
organizations will violate the law, and it is not. Their power
may be effectively exercised without violence or illegality, and
it cannot be disrespect to Congress to let a committee of the
Senate speak for it and tell the reason and purposes of its legis-
lation. The Committee on Education in its report said of the
bill: "The measure under consideration may properly be called
a voluntary arbitration bill, having for its object the settle-
ment of disputes between capital and labor, as far as the
interstate transportation companies are concerned. The neces-
sity for the bill arises from the calamitous results in the way
of ill-considered strikes arising from the tyranny of capital
or the unjust demands of labor organizations, whereby the
business of the country is brought to a standstill and thousands
of employés, with their helpless wives and children, are con-
fronted with starvation." And, concluding the report, said:
"It is our opinion that this bill, should it became a law, would
reduce to a minimum labor strikes which affect interstate com-
merce, and we therefore recommend its passage."

With the report was submitted a letter from the Secretary
of the Interstate Commerce Commission, which expressed the
judgment of that body, formed, I may presume, from ex-
perience of the factors in the problem. The letter said: "With
the corporations as employers on one side and the organiza-

tions of railway employés as the other, there will be a measure of equality of power and force which will surely bring about the essential requisites of friendly relation, respect, consideration, and forebearance." And again: "It has been shown before the labor commission of England that where the associations are strong enough to command the respect of their employers the relations between employer and employé seem most amicable. For there the employers have learned the practical convenience of treating with one thoroughly representative body instead of with isolated fragments of workmen; and the labor associations have learned the limitations of their powers."

It is urged by defendant in error that "there is a marked distinction between a power to regulate commerce and a power to regulate the affairs of an individual or corporation engaged in such commerce," and how can it be, it is asked, a regulation of commerce to prevent a carrier from selecting his employés or constraining him to keep in his service those whose loyalty to him is "seriously impaired, if not destroyed, by their prior allegiance to their labor unions"? That the power of regulation extends to the persons engaged in interstate commerce is settled by decision. *Employers' Liability Cases*, 207 U. S. 463, and the cases cited in Mr. Justice Moody's dissenting opinion. The other proposition points to no evil or hazard of evil. Section 10 does not constrain the employment of incompetent workmen and gives no encouragement or protection to the disloyalty of an employé or to deficiency in his work or duty. If guilty of either he may be instantly discharged without incurring any penalty under the statute.

Counsel also makes a great deal of the difference between direct and indirect effect upon interstate commerce, and assert that § 10 is an indirect regulation at best and not within the power of Congress to enact. Many cases are cited, which, it is insisted, sustain the contention. I cannot take time to review the cases. I have already alluded to the contention, and it is enough to say that it gives too much isolation to § 10.

The section is part of the means to secure and make effective the scheme of arbitration set forth in the statute. The contention, besides, is completely answered by *Employers' Liability Cases, supra.* In that case, as we have seen, the power of Congress was exercised to establish a rule of liability of a carrier to his employés for personal injuries received in his service. It is manifest that the kind or extent of such liability is neither traffic nor intercourse, the transit of persons or the carrying of things. Indeed such liability may have wider application than to carriers. It may exist in a factory; it may exist on a farm, and in both places, or in commerce—its direct influence might be hard to find or describe. And yet this court did not hesitate to pronounce it to be within the power of Congress to establish. "The primary object," it was said in *Johnson* v. *Railroad,* 196 U. S. 17, of the safety appliance act, "was to promote *the public welfare* by securing the safety of employés and travelers." The rule of liability for injuries is even more round about in its influence on commerce and as much so as the prohibition of § 10. To contend otherwise seems to me to be an oversight of the proportion of things. A provision of law which will prevent or tend to prevent the stoppage of every wheel in every car of an entire railroad system certainly has as direct influence on interstate commerce as the way in which one car may be coupled to another, or the rule of liability for personal injuries to an employé. It also seems to me to be an oversight of the proportions of things to contend that in order to encourage a policy of arbitration between carriers and their employés which may prevent a disastrous interruption of commerce, the derangement of business, and even greater evils to the public welfare, Congress cannot restrain the discharge of an employé, and yet can, to enforce a policy of unrestrained competition between railroads, prohibit reasonable agreements between them as to the rates at which merchandise shall be carried. And mark the contrast of what is prohibited. In the one case the restraint, it may be, of a whim—certainly of nothing that affects the ability of an employé to perform his

duties; nothing, therefore, which is of any material interest to the carrier; in the other case a restraint of a carefully considered policy which had as its motive great material interests and benefits to the railroads, and, in the opinion of many, to the public. May such action be restricted, must it give way to the public welfare, while the other, moved, it may be, by prejudice and antagonism, is intrenched impregnably in the Fifth Amendment of the Constitution against regulation in the public interest.

I would not be misunderstood. I grant that there are rights which can have no material measure. There are rights which, when exercised in a private business, may not be disturbed or limited. With them we are not concerned. We are dealing with rights exercised in a *quasi*-public business and therefore subject to control in the interest of the public.

I think the judgment should be affirmed.

MR. JUSTICE HOLMES, dissenting.

I also think that the statute is constitutional, and but for the decision of my brethren I should have felt pretty clear about it.

As we all know, there are special labor unions of men engaged in the service of carriers. These unions exercise a direct influence upon the employment of labor in that business, upon the terms of such employment and upon the business itself. Their very existence is directed specifically to the business, and their connection with it is at least as intimate and important as that of safety couplers, and, I should think, as the liability of master to servant, matters which, it is admitted, Congress might regulate, so far as they concern commerce among the States. I suppose that it hardly would be denied that some of the relations of railroads with unions of railroad employés are closely enough connected with commerce to justify legislation by Congress. If so, legislation to prevent the exclusion of such unions from employment is sufficiently near.

The ground on which this particular law is held bad is not so much that it deals with matters remote from commerce among the States, as that it interferes with the. paramount · individual rights, secured by the Fifth Amendment.· The section is, in substance, a very limited interference with freedom of contract, no more. It does not require the carriers to employ any one. It does not forbid them to refuse to employ any one, for any reason they deem good, even where the notion of a choice of persons is a fiction and wholesale, employment is necessary upon general principles that it might be proper to control. The section simply prohibits the more powerful party to exact certain undertakings, or to threaten dismissal or unjustly discriminate on certain grounds against those already employed. I hardly can suppose that the grounds on which a contract lawfully may be made to end are less open to regulation than other terms. So I turn to the general question whether the employment can be regulated at all. I confess that I think that the right to make contracts at will that has been derived from the word liberty in the amendments has been stretched to its extreme by the decisions; but they agree that sometimes the right may be restrained. Where there is, or generally is believed to be, an important ground of public policy for restraint the Constitution does not forbid it, whether this court agrees or disagrees with the policy pursued. It cannot be doubted that to prevent strikes, and, so far as possible, to foster its scheme of arbitration, might be deemed by Congress an important point of policy, and I think it impossible to say that Congress might not reasonably think that the provision in question would help a good deal to carry its policy along. But suppose the only effect really were to tend to bring about the complete unionizing of such railroad laborers as Congress can deal with, I think that object alone would justify the act. I quite agree that the question what and how much good labor unions do, is one on which intelligent people may differ,—I think that laboring men sometimes attribute to them advantages, as

many attribute to combinations of capital disadvantages, that really are due to economic conditions of a far wider and deeper kind—but I could not pronounce it unwarranted if Congress should decide that to foster a strong union was for the best interest, not only of the men, but of the railroads and the country at large.