[Crim. No. 2141. In Bank.—July 30, 1918.]

## In the Matter of the Application of SAM FARB for a Writ of Habeas Corpus.

CONSTITUTIONAL LAW — STATUTES—POLICE POWER — REGULATING "TIP-PING."—The police power of the state may be invoked to prevent by regulation some of the evils arising from the tipping custom in places where it has developed almost into organized blackmail.

ID.—FREEDOM OF CONTRACT.—Contracts to work, contracts to employ, and liberty freely to make such contracts, come under the protection of article I of the constitution.

ID.—FREEDOM TO CONTRACT QUALIFIED BY POLICE POWERS.—The constitutional guaranty freely to make contracts of employment is qualified by the legislative authority to enact proper laws under the police powers of the state.

ID.—LEGISLATIVE DISCRETION.—Large discretion is vested in the legislature in determining the proper subjects for the exercise of the police power and also the methods of putting that power in force by statutes.

ID.—COURTS—DUTY IN PASSING ON POLICE LAWS.—Courts, in passing upon the constitutionality of such laws, must determine whether or not the legislative discretion has been exercised in such manner as to interfere unduly with the right of contract.

ID.—MASTER AND SERVANT—CONTRACT TO SURRENDER TIPS TO EMPLOYER. There is nothing essentially immoral in a contract between employer and employee whereby the employee agrees to work for a certain wage and to surrender all tips to his employer.

ID.—STATUTE REGULATING DISPOSITION OF TIPS—CRIMINAL LAW—STATUTE INVALID.—The statute forbidding employers to demand or receive from employees any portion of any tips or gratuities received by them under a penalty of fine or imprisonment is void because in

conflict with the "due process" provision of the constitution of the United States, and with section 13 of article I of the constitution of California.

APPLICATION for a Writ of Habeas Corpus directed to the Sheriff of the City and County of San Francisco.

The facts are stated in the opinion of the court.

Oscar Samuels, and J. Samuels, for Petitioner.

Roche & Johnson, for Labor Commissioners.

John T. Williams, for Thos. F. Finn, Sheriff.

MELVIN, J.—A writ of *habeas corpus* was issued upon the petition of Sam Farb, found guilty under a complaint charging him with violation of chapter 172 of the Statutes of California of 1917. It is conceded by petitioner's counsel that the one question involved in a final determination of this matter is whether or not that part of the statute is constitutional which prohibits an employer from entering into a contract requiring an employee to surrender to the employer all tips or gratuities received for services rendered to the public on behalf of the employer. The part of the act pertinent to this discussion is as follows:

"Any employer or agent or representative of an employer or other person having authority from his employer to hire, employ or direct the services of other persons in the employment of said employer, who shall demand or receive directly or indirectly from any person then in the employment of said employer, any fee, gift or other remuneration or consideration, or any part or portion of any tips or gratuities received by such employee while in the employment of said employer, in consideration or as a condition of such employment or hiring or employing any person to perform such services for such employer or of permitting said person to continue in such employment, is guilty of a misdemeanor." (Stats. 1917, p. 257.)

It is the contention of petitioner that this statute permits a violation of the right of employers and employees freely to enter into contracts; that it is in conflict with the provisions

of the federal and state constitutions; and that it seeks to make an improper extension of the police power of the state.

Respondent seeks to justify the statute upon the ground that it is designed to relieve the public against fraud and imposition arising from the employer's failure to notify the public that the gratuities bestowed upon employees go to the employer; and upon the further ground that the legislature is empowered to enact such laws to "provide for the comfort, health, safety and general welfare of any and all employees." (Art. XX, sec. 17½, Cal. Const.) It is further contended in opposition to the writ that regulation will not accomplish the removal of the evil to be overcome, and that, therefore, the legislature has the right to prohibit any agreement whereby an employer may enjoy any part of the gratuities tendered to the employee.

At the outset it is to be noted that the statute under review does not by its terms or otherwise seek to limit or reduce the bestowal of tips or the practices by which either the keepers of places of public resort or those employed therein may try to wheedle or extort contributions from customers. That the custom of tipping has in many communities grown into proportions that astonish and dismay the person of moderate wealth is undoubtedly true; and that in many establishments one seeking accommodation must either tip or go unserved is equally well known. Therefore, we may well concede that the police power might be invoked to prevent, by regulation, some of the evils arising from the tipping custom in those places where it has developed almost into organized blackmail. We cannot see how the statute before us would have any tendency by its operation to benefit the public generally. Indeed, it would rather have the opposite tendency, because the waiter or other employee engaged in serving the public would probably seek very keenly to coax or extort contributions from his customers if he were the sole beneficiary of such payments, while his enthusiasm and art would be less heartily enlisted in getting from customers gifts to be enjoyed exclusively or principally by the employer. The statute, if defensible at all, must be upheld, therefore, as a measure tending reasonably to protect employees in their health or safety or to preserve their morals or to promote their general welfare. That contracts to work, contracts to employ, and liberty freely to make such contracts come under the protection of the very first article of our constitution is un-

doubtedly true.  It is also true that the constituional guaranty freely to make such agreements, while apparently absolute, is qualified by the legislative authority to enact proper laws under the police powers of the state.  It is also true that ·a large discretion is vested in the legislature in determining not only the proper subjects for the exercise of the police power, but the methods of putting that power in force by statutes.  Yet the courts must determine, in passing upon the constitutionality of such laws, whether or not that discretion has been exercised in such manner as to interfere unduly with the right of contract.  We might quote very many authorities from many jurisdictions to illustrate the principles upon which such questions as that now before us should be determined, but we find a brief and sufficient declaration of them in Mr. Justice Shaw's language, in the opinion of this court in a matter involving the right of the limitation by law of the hours of work for women in certain occupations. We refer to *In re Miller*, 162 Cal. 687–693, [124 Pac. 427], where the following language was used:

"Because of the great value to mankind and the consequent paramount importance of the preservation of individual liberty, it is universally admitted and held that the police powers of the legislature are not absolute or unlimited. These personal rights cannot be taken away or impaired at the mere will of the legislature, nor at all, unless public welfare demands it.  So far as the effect on himself alone is concerned, each person has the absolute right to judge for himself whether the hard labor which he voluntarily performs is for his best interest or not.  The legislature cannot judge for persons in this respect and interfere solely to prevent them from injuring themselves by excessive labor.  The injury must be of such character and extent and to such a number of persons that it may be reasonably supposed that it will cause injury to others, that is, to the community in general, or, as it is expressed, to the public health and the general welfare.  (*Lawton* v. *Steele*, 152 U. S. 136, [38 L. Ed. 385; 14 Sup. Ct. Rep. 499].)

"The means adopted to produce the public benefit intended; or to prevent the public injury, must be reasonably necessary to accomplish that purpose and not unduly oppressive upon individuals.  The determination of the legislature as to these matters is not conclusive, but is subject to the supervision of

the courts, and if the above qualities are wanting, a law arbitrarily interfering with the right of contract, or imposing restrictions upon lawful occupations, will be held void.''

In *Miller* v. *Wilson*, 236 U. S. 373, [L. R. A. 1915F, 829, 59 L. Ed. 628, 35 Sup. Ct. Rep. 342], involving the same statute, Mr. Justice Hughes thus (at page 380) briefly described the question arising in all cases of this sort: ''As the liberty of contract guaranteed by the constitution is freedom from arbitrary restraint—not immunity from reasonable regulation to safeguard the public interest—the question is whether the restrictions of the statute have reasonable relation to a proper purpose.''

Upon the principles above announced courts have not hesitated to sustain statutes enacted in pursuance of the police power having the legitimate function of protecting the health or morals of certain classes, but they have been equally ready to apply constitutional rules to the overthrow of laws which under the guise of such regulation have interfered with the freedom of contract. It will suffice for the purposes of this discussion to cite a few of the leading cases of that kind. In *Adams* v. *Tanner*, 244 U. S. 590, [Ann. Cas. 1917D, 973, L. R. A. 1917F, 1163, 61 L. Ed. 1336, 37 Sup. Ct. Rep. 662], the supreme court of the United States considered a law enacted by the people of the state of Washington, by which it was declared unlawful for any employment agent to demand or receive either directly or indirectly from any person seeking employment any fee for furnishing him or her with employment or information leading thereto. The statute was held to be in violation of the guaranty of liberty secured by the fourteenth amendment. In the course of the prevailing opinion in that case Mr. Justice McReynolds, answering the contention that certain abuses had grown up in connection with the business of conducting employment agencies, used (at page 594) the following language: ''Certainly there is no profession, possibly no business, which does not offer peculiar opportunities for reprehensible practices; and as to every one of them, no doubt, some can be found quite ready earnestly to maintain that its suppression would be in the public interest. Skillfully directed agitation might also bring about apparent condemnation of any one of them by the public. Happily for all, the fundamental guaranties of the constitu-

tion cannot be freely submerged if and whenever some ostensible justification is advanced and the police power invoked.''

This language is peculiarly apt in view of the arguments advanced in defense of the statute here under review. We are cited to the incident of a man who employed girls to attend to the checking of hats. These girls were required, as a condition of retaining their employment, to put all tips into a locked box through a slot, and were compelled to comply with the requirement that they should wear dresses and aprons having no pockets, lest they might secrete some of the money and take it away with them. Such an exaction would, of course, be humiliating to the employee, but one desiring to avoid it might resign.

In *Coppage* v. *State of Kansas,* 236 U. S. 1, [L. R. A. 1915C, 960, 59 L. Ed. 441, 35 Sup. Ct. Rep. 240], a statute of the defendant in error making it a misdemeanor for an employer to require an employee to agree not to become a member of any labor organization during the time of the employment was held repugnant to the ''due process'' clause of the fourteenth amendment. After citing *Adair* v. *United States,* 208 U. S. 161, [13 Ann. Cas. 764, 52 L. Ed. 436, 28 Sup. Ct. Rep. 277], to the effect that the right to sell and the right to purchase labor are correlative and each subject to regulation by contract, Mr. Justice Pitney, who wrote the opinion of the court, said (page 12) : ''Granted the equal freedom of both parties to the contract of employment, has not each party the right to stipulate upon what terms only he will consent to the inception, or to the continuance, of that relationship? And may he not insist upon an express agreement, instead of leaving the terms of the employment to be implied? Can the legislature in effect require either party at the beginning to act covertly; concealing essential terms of the employment— terms to which, perhaps, the other would not willingly consent—and revealing them only when it is proposed to insist upon them as a ground for terminating the relationship? . . . Can the right of making contracts be enjoyed at all, except by parties coming together in an agreement that requires each party to forego, during the time and for the purpose covered by the agreement, any inconsistent exercise of his constitutional rights?

''These queries answer themselves. The answers, as we think, lead to a single conclusion: Under constitutional free-

dom of contract, whatever either party has the right to treat as sufficient ground for terminating the employment, where there is no stipulation on the subject, he has the right to provide against by insisting that a stipulation respecting it shall be a *sine qua non* of the inception of the employment, or of its continuance if it be terminable at will.''

The statute before us is not defensible as a regulatory meas ure upon any of the grounds which have operated to uphold laws prescribing hours of labor, conditions of workshops, and the like, but this court is urged to uphold it upon the ground that it is designed to protect the public from fraud. We are told that gratuities are bestowed not upon the employer but upon the employee as a reward for promptness or politeness or skill beyond the mere performance of his duty to serve his master's customers, and that when this personal gift is appropriated by the employer a fraud upon the giver is perpetrated. If we concede the correctness of this contention, for the purposes of discussion, still we must declare the statute void as seeking to overcome by prohibition of any contract between employer and employee, a deception which would instantly disappear if the former were required to post in his place of business a notice of the terms of the contract whereby he was to have the benefit of gratuities. It can hardly be doubted that an employer might (as a few of them do) forbid the employee, under pain of dismissal for disobedience, to accept any tips. This would be no fraud upon the customer. How, then, would the customer be defrauded if he were informed that he might not give a tip to the employee but might bestow a gratuity upon the employer? To ask the question answers it. The law does not tolerate the prohibition of something which may be regulated in such way as to overcome any evils which may be incidentally connected with it. As was said in *Adams* v. *Tanner, supra:* ''Appellants' occupation as agent for workers cannot exist unless the latter pay for what they receive. To say it is not prohibited because fees may be collected for something done in behalf of other principals is not good reasoning. The statute is one of prohibition, not regulation. 'You take my house when you do take the prop that doth sustain my house; you take my life when you do take the means whereby I live!' ''

In other words, even if it be conceded that the object of the statute is to protect the public from fraud existing because of

keeping people in ignorance of the ultimate disposition of tips bestowed upon employees, the means used to accomplish that object are most unreasonable. It has been held in California that while the legislature might well regulate or prohibit the transportation of diseased fruit, or prevent deception in the label, a law requiring every package of fruit to bear a label naming the county and immediate locality in which the fruit was grown could not be upheld as a legitimate exercise of the police power. (*Ex parte Hayden*, 147 Cal. 649, [109 Am. St. Rep. 183, 1 L. R. A. (N. S.) 184, 82 Pac. 649].) It has also been held that while regulations to prevent deception of the public by the offer of stale eggs as fresh ones are beneficial laws and should be upheld, this object would not be attained by laws requiring each egg brought from without the state of California to bear a printed declaration of the fact of its importation. (*Matter of Application of Foley*, 172 Cal. 744, [Ann. Cas. 1918A, 180, 158 Pac. 744].) These and other authorities which might be cited confirm the doctrine that reasonable regulation, where it is practicable, is the only method by which incidental evils sometimes attaching to a legitimate business or calling may be overcome and abolished.

In the foregoing discussion it has been conceded for the purposes of argument that concealment from the customer of the contract by which gratuities are enjoyed by the employer amounts to a fraud upon the said customer. There is nothing essentially immoral in the contract itself whereby the employee agrees to work for a certain wage and to surrender all tips to his employer. The supreme court of Iowa (correctly, we think) approved an instruction to the effect that while the plaintiff, a bootblack, would be entitled to any gifts by way of tips, the employer might, if he could, prove an agreement on plaintiff's part to turn the tips over to him. (*Zappas* v. *Roumeliote*, 156 Iowa, 709, [137 N. W. 935].) If it is lawful, as between employer and employee, to provide for the ownership of tips given into the possession of the latter, it can hardly be said that the patron's ignorance of it makes the contract unlawful. A waiter, for example, might buy a suit of clothes and agree with the tailor that he would apply all tips to the payment of the bill for the garments until the stipulated price should be fully paid. Would the patrons bestowing those gratuities be defrauded by their igno-

rance of the contract? Assuredly they would not. Yet such
a contract does not differ in principle from one whereby the
servant agrees to forego the enjoyment of tips for the sake
of his salary and of retaining his position. In either case it
would make no difference whether the extra payment or gift
were bestowed because of the good quality of the food (for
which the waiter might not be responsible); or the comfort
of the chair (for which the barber might deserve no credit);
or because of the beauty of the girl in the hatroom, the sweet
voice of the cabaret singer, the deftness of the bootblack, or
any other attribute or excellence of a personal nature. Even
if we concede that the gratuity is essentially a personal earn-
ing of the employee, nevertheless it must be true that one
may enter into a contract involving the expenditure of one's
earnings.

The statute under review is void, because it is in conflict
with the "due process" provision of the constitution of the
United States and with section 13 of article I of the constitu-
tion of California.

The petitioner is dismissed from custody.

Shaw, J., Sloss, J., Wilbur, J., and Lorigan, J., concurred.

ANGELLOTTI, C. J., Concurring.—I am of the opinion
that in so far as the act under discussion prohibits any con-
tract between the employer and the employee that all or any
tips and gratuities received by the employee while in the em-
ployment of the employer shall belong and be paid to the em-
ployer, or that prohibits any demand or receipt by the
employer from the employee of the tips and gratuities to
which he is entitled under any such contract, it is in violation
of provisions of the federal and state constitutions. In my
opinion the only conceivable ground upon which this portion
of the act might be upheld is that it was essential to the pro-
tection of the public against fraud. As is shown by the pre-
vailing opinion, the only possible fraud on the public is the
keeping of them in ignorance of the ultimate disposition of
tips and gratuities conferred by them. That this evil might
be sufficiently overcome by reasonable regulation short of
absolutely prohibiting a contract between the employee and
employer is also sufficiently shown in the opinion. This being
so, the authorities amply sustain the conclusion that there can

be no such prohibiting of contract. (See, also, *In re Kelso,* 147 Cal. 609, [109 Am. St. Rep. 178, 2 L. R. A. (N. S.) 796, 82 Pac. 241].)

I therefore concur in the judgment discharging the petitioner.

RICHARDS, J., *pro tem.,* Dissenting.—I dissent.

The statute under review in this proceeding was not chiefly designed, as the prevailing opinion seems to indicate, "to protect employees in their health or safety or to preserve their morals or to promote their general welfare." Its chief and obvious purpose was to deal with the relation or transaction arising between patrons of places of public resort for service, pleasure, or instruction, and the servitors in such places, wherein the former seeks to insure or reward promptness, fidelity, and courtesy on the part of the latter in the performance of some particular service by the giving to such servitor a sum of money popularly known as a "tip." In the individual instance the offering is usually small and the service slight, but in the concrete a very large proportion of the general public is affected by what has grown to become an almost universal custom. Every person who travels in this age of travel or who patronizes hotels or restaurants or attends theaters, lectures, or other public places of amusement or instruction is affected by the custom of giving and receiving tips.

Whether or not it is a pernicious custom savoring of extortion, and furnishing a fertile soil for flunkeyism, favoritism, and partiality in respect to those elements of promptness, fidelity, and courtesy to which patrons of such public places or conveniences are equally entitled without the voluntary offering or the compulsion of such gratuities, the law in question does not attempt to determine. All that it does is to say that the employer and the servitor shall not make an agreement between themselves the effect of which would be to divert the gratuity given by the individual patron from the person for whom it was intended, and thus destroy the incentive to prompt, faithful, and courteous service which prompted the gift. Can it be said that a statute which has for its object the preservation of the spirit, intent, and effect of a relation and agreement to which in the concrete the general public is the most largely interested party is invalid when it seeks to

prevent the proprietor and the servitor from making another agreement, to which the general public is not a party, the effect of which is to divert the consideration, destroy the incentive, and render ineffectual the relation created by the former agreement? To my mind the right of freedom of contract does not extend so far as to embrace the freedom to make one contract which shall violate the spirit, intent, and obligation of another, particularly when that other is one of a class of like agreements so infinite in number as to affect the public at large.

In addition to this, however, the contract, the freedom to enter into which is upheld by the prevailing opinion, is one which is in its essence unconscionable and fraudulent, and is also one which in many, if not most, instances is devoid of that very element of freedom as to one of the parties by which it is sought to be justified. It is unconscionable because by its terms the employer, as the proprietor of the place or service in connection with which the tip is received by his employee, is not entitled to it, since he is already fully paid for whatever he furnishes by his regular charges, which cover and compensate him for the fullest measure of promptness, fidelity, and courtesy toward his patrons on the part of his employees. To permit him to exact more is not only to legalize an overcharge, but is also to encourage discriminations in the price and quality of his service as between those of his patrons who do and those who do not submit to the overcharge. It is fraudulent in respect to those patrons because it secretly aims to take from them that which they intended for another, and because its effect is to destroy the very incentive for doing those things for which the gratuity was given. The porter, the waiter, the bellboy, the chambermaid, who either willingly or unwillingly enters into a contract with his or her employer by which the tip is to be surrendered, has no longer any interest in doing promptly, faithfully, and courteously the service which the tip was given to insure, and to the extent of the inevitable lapses in the efficiency of such service the immediate patron, and by extension the general public, is defrauded of its due.

The suggestion in the prevailing opinion that all this would be avoided by the simple expedient of having the proprietor post in his establishment a notice to the effect that all tips paid to his employees were by agreement to belong to the em-

ployer has, it is true, the merit of simplicity, but has nothing else to recommend it. That such notices, as a matter of common knowledge, have never been posted anywhere may be taken to be sufficient proof that the publication of such an agreement by that means would defeat the very purpose for which the agreement was made by stopping the flow of tips at once, since the public would have no interest in giving tips to servitors who had no longer any interest in doing the service with the degree of promptness, fidelity, and courtesy which the tip was given to induce. Besides, it is not the province of the courts to suggest similar ways of remedying admitted evils as a reason for refusing to uphold those which the legislature has seen fit to adopt in the exercise of its right of selection in the choice of remedies. In so far as the elements of freedom of contract, as between the proprietor and his employee, is concerned, upon which emphasis is laid in the prevailing opinion, it may be safely said that the trend of modern authority and decision is against the longer acceptance of that outworn fiction upon which Adam Smith predicated much of his impractical economics. How much is there of mutual freedom of contract between the proprietor, who has his choice and time in the matter of selecting his servants, and the average applicant for the position of waiter or bellboy or chambermaid, whose every hour of unemployment is a step nearer to starvation? We have already banished this fiction from many of our statutes and decisions regulating the obligations and liabilities arising out of the relation of master and servant. Why, then, should we invoke it to defeat a piece of salutary legislation framed in the public interest and intended not only to forbid fraud upon the public, but also to prevent employers from compelling their employees, under the pretense of an agreement which would not as a rule, from the very nature of things, be voluntary, to yield up to their employers that which they have no right to appropriate? The illustration used in the prevailing opinion of the waiter agreeing with his tailor to turn over to him his tips in payment for a suit of clothes has no possible aptitude, since in that case the incentive is left in the waiter to earn the tips in order that he may the sooner enjoy the clothes, while no such incentive remains when by previous agreement or compulsion his employer appropriates his tips; and if it be argued that he would still strive to deserve the tip in order to hold

the job, then what becomes of the argument based upon his supposititious freedom of contract?

The cases cited in support of the views expressed in the prevailing opinion have no application to the instant case, since their facts bear no similitude to those of the case at bar. The statute under review is novel, and the case is one of first impression. The subject with which the statute deals is one in which the public interest is so far involved as to bring it properly within the purview of the police powers of the state. It is practically conceded in the prevailing opinion that the legislature might well and safely have enacted a statute abolishing altogether the custom of tipping, and declaring it unlawful to permit this practice in any place of public resort, for the reason, as well stated therein, "that the custom of tipping has in many communities grown into proportions that astonish and dismay persons of moderate wealth, and that in many establishments one seeking accommodation must either tip or go unserved." That the state has the almost unlimited power to regulate that which it has full power to destroy has been too frequently decided to require the citation of authority. The statute in question is a step in the way of such regulation which should be sustained upon all the grounds urged in its support.

The writ should, therefore, be discharged and the petitioner remanded.