[Crim. No. 190.   Fourth Appellate District.—March 9, 1936.]

In the Matter of the Application of ED MOFFETT, Petitioner, for a Writ of Habeas Corpus.

George A. Work for Petitioner.

No appearance for Respondent.

MARKS, J.—Petitioner filed his petition for a writ of *habeas corpus* to secure his release from the jail of Tulare County, where he was confined by the sheriff under a judgment of a justice of the peace sitting in Orosi Township in Tulare County. The only return made by the sheriff to the writ is the order under which petitioner was held. Its sufficiency is not attacked and for the purposes of this opinion we will assume its sufficiency and proper form. No brief has been filed on behalf of the sheriff or in support of the legality of the detention of petitioner.

The facts shown by the record before us may be briefly summarized as follows: The Southern Sierra Pine Company is a partnership, of which petitioner was the managing member, organized for the manufacture of lumber near the town of Cutler in Orosi Township, Tulare County. The partnership had insufficient capital with which to pay its operating expenses and therefore entered into a contract with each of its employees whereby they were to work at a fixed compensation in cash, not to be paid on any fixed or regularly recurring dates but when the lumber could be sold and out of the proceeds of such sales as the money was collected. Ralph Goodwin was employed under such an express contract on May 12, 1935, at a compensation of fifty cents an hour which was increased on July 1, 1935, to fifty-five cents an hour. Goodwin was not discharged but voluntarily left the employ of the partnership on August 31, 1935. He had earned $431.31 and had been paid $308.50 during his employment and $7 after he had quit, leaving a balance of $115.81 unpaid on October 22, 1935, at the time the complaint was filed in the justice's court. At that time there were several thousand dollars' worth of manufactured lumber unsold in the yards of the partnership.

The complaint in this action contained three counts. The first alleged that on July 25, 1935, petitioner continued to employ one or more in and about the sawmill without maintaining semi-monthly or two monthly pay days and particularly without paying such employees in full for their services for the previous semi-monthly period on or before the last-

mentioned date as required by sections two and four of the Semi-Monthly Pay Day Law. (Stats. 1919, chap. 202, as amended.) Count two alleged that petitioner failed to post and keep posted in a conspicuous place at the place of employment, or elsewhere, where the employees could see it, or at the office or nearest agency for payment kept by the employer, any notice specifying any regular pay day or pay days as required by the same sections of the same law. The third count deserves no notice here. It does not charge a public offense, or at best any other offense than that charged in the first count.

The two sections of the act in question provide that an employer must pay his employees the money earned by them semi-monthly, or twice each month, on regular pay days to be designated in advance, and post, and keep posted, conspicuously at a designated place, a notice specifying the regular pay days and the time and place of payment of wages.

It is admitted that petitioner did not have two, or any, regular pay days each month for his employees and did not post and keep posted the notice we have mentioned. It is obvious that he could not conform to the requirements of the statute under the terms of his contracts with his employees as wages became due and payable when and as soon as money was received for the lumber sold and in such amounts as could be paid from the returns from the sales. The question squarely presented here is: Does the Semi-monthly Pay Day Law prohibit a special contract of employment between the employer and his employee such as was made between the partnership represented by petitioner and Ralph Goodwin?

We have not been cited to nor have we found any California case in which this precise question has been decided. However, the following cases decided under the Wage Law of 1911 (Stats. 1911, p. 1268, as amended), and under the present law, may be cited: *In re Crane*, 26 Cal. App. 22 [145 Pac. 733]; *Moore* v. *Indian Spring etc. Co.*, 37 Cal. App. 370 [174 Pac. 378]; *Manford* v. *Singh*, 40 Cal. App. 700 [181 Pac. 844]; *Klaffki* v. *Kaufman*, 52 Cal. App. 48 [198 Pac. 36]; *Martin* v. *Going*, 57 Cal. App. 631 [207 Pac. 935]; *In re Oswald*, 76 Cal. App. 347 [244 Pac. 940]; *In re Samaha*, 130 Cal. App. 116 [19 Pac. (2d) 839]; *Sears* v. *Superior Court*, 133 Cal. App. 704 [24 Pac. (2d) 842]; *In re Sears*, 137 Cal. App. 308 [30 Pac. (2d) 571]; *Fueller* v. *Justice's Court*, 134

Cal. App. 305 [25 Pac. (2d) 248]; *In re Ballestra,* 173 Cal. 657 [161 Pac. 120]. In these cases certain phases of the Wage Act of 1911 were held unconstitutional, and certain phases of the Wage Act of 1919 were held constitutional under the police powers of the state which permits the enactment of laws to promote the general welfare of the citizens of the state. See, also, *In re Miller,* 162 Cal. 687 [124 Pac. 427], and *In re Farb,* 178 Cal. 592 [174 Pac. 320, 3 A. L. R. 301].

The limitations placed upon the exercise of the police power in cases similar to the one we are considering are thus defined in *Ex parte Hayden,* 147 Cal. 649 [82 Pac. 315, 109 Am. St. Rep. 183] : ''It has come to be well recognized that the liberty and the pursuit of happiness in which the individual is protected by the Constitution of the United States and of the state applies as fully to his right of contract, his right to follow a legitimate vocation, untrammeled by unnecessary regulations, as it does to the freedom from arrest or restraint of his person. This subject has received recent consideration by this court, and it is unnecessary to do more than refer to *Ex parte Dickey,* 144 Cal. 234 [77 Pac. 924, 103 Am. St. Rep. 82, 1 Ann. Cas. 428, 66 L. R. A. 928].

''Putting out of contemplation, therefore, the fundamental right of government to subject private property to taxation and to take such property in time of public calamity and peril, the right of the state to impose burdens upon such property where the business is legitimate and innocuous,—in other words, to regulate harmless vocations,—is found in the police power alone. (*Young* v. *Commonwealth,* 101 Va. 853 [45 S. E. 327] ; *Holden* v. *Hardy,* 169 U. S. 366 [18 Sup. Ct. 383, 42 L. Ed. 780].) The police power, deriving its existence from the rule that the safety of the people is the supreme law, justifies legislation upon matters pertaining to the public welfare, the public health, or the public morals. (Cooley on Constitutional Limitations, 7th ed., p. 837; *Ruhstrat* v. *People;* 185 Ill. 133 [47 N. E. 41, 76 Am. St. Rep. 30, 49 L. R. A. 181].) But the legislature, under the guise of police regulations, cannot enact laws which do not pertain to one or the other of those objects, and which impose onerous and unnecessary burdens upon business and property. By this court it has been said (*Ex parte Whitwell,* 98 Cal. 73 [32 Pac. 870, 35 Am. St. Rep. 152, 19 L. R. A. 727]) : 'But it is not true that when this power is exerted for the purpose of

regulating a business or occupation which in itself is recognized as innocent and useful to the community, the legislature is the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue such business or profession. As the right of a citizen to engage in such a business or follow such a profession is protected by the Constitution, it is always a judicial question whether any particular regulation of such right is a valid exercise of legislative power. . . . This principle is stated very forcibly in the case of *Mugler* v. *Kansas*, 123 U. S. 623, 661 [8 Sup. Ct. 273, 31 L. Ed. 205], in the following language: ''The courts are not bound by mere forms, nor are they to be misled by mere pretense. They are at liberty—indeed, are under a solemn duty—to look at the substance of things whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.'' ' ''

In the case of *Adair* v. *United States*, 208 U. S. 161 [28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764, the Supreme Court of the United States had before it the question of the validity of an act of Congress which prohibited certain employers from discharging employees for specified causes. That court said:

''The first inquiry is whether the part of the tenth section of the act of 1898 upon which the first count of the indictment was based is repugnant to the fifth amendment of the Constitution, declaring that no person shall be deprived of liberty or property without due process of law. In our opinion that section, in the particular mentioned, is an invasion of the personal liberty, as well as of the right of property, guaranteed by that amendment. Such liberty and right embrace the right to make contracts for the purchase of the labor of others, and equally the right to make contracts for the sale of one's own labor; each right, however, being subject to the fundamental condition that no contract, whatever its subject matter, can be sustained which the law, upon reasonable grounds, forbids as inconsistent with the public interests,

or as hurtful to the public order, or as detrimental to the common good. This court has said that 'in every well-ordered society, charged with the duty of conserving the safety of its members, the rights of the individual in respect of his liberty may, at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.' *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29 [25 Sup. Ct. 358, 49 L. Ed. 643, 651, 3 Ann. Cas. 765], and authorities there cited. Without stopping to consider what would have been the rights of the railroad company under the fifth amendment, had it been indicted under the act of Congress, it is sufficient in this case to say that, as agent of the railroad company, and, as such, responsible for the conduct of the business of one of its departments, it was the defendant Adair's right—and that right inhered in his personal liberty, and was also a right of property—to serve his employer as best he could, so long as he did nothing that was reasonably forbidden by law as injurious to the public interests. It was the right of the defendant to prescribe the terms upon which the services of Coppage would be accepted, and it was the right of Coppage to become or not, as he chose, an employee of the railroad company upon the terms offered to him. Mr. Cooley, in his treatise on Torts, p. 278, well says: 'It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with anyone with whom he can make contracts, and, if he is wrongfully deprived of this right by others, he is entitled to redress.' "

In the case of *Lochner* v. *New York,* 198 U. S. 45 [49 L. Ed. 937, 25 Sup. Ct. 539, 3 Ann. Cas. 1133], in which a law involving hours of labor was involved, the Supreme Court of the United States said: "The general right to make a contract in relation to his business is part of the liberty of the individual protected by the fourteenth amendment of the federal Constitution. *Allgeyer* v. *Louisiana,* 165 U. S. 578 [17 Sup. Ct. 427, 41 L. Ed. 832]. Under that provision no state can deprive any person of life, liberty, or property without due process of law. The right to purchase or sell labor is

part of the liberty protected by this amendment, unless there are circumstances which exclude the right. There are, however, certain powers, existing in the sovereignty of each state in the Union, somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated, and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals, and general welfare of the public. Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the state in the exercise of those powers, and with such conditions the fourteenth amendment was not designed to interfere. *Mugler* v. *Kansas*, 123 U. S. 623 [31 L. Ed. 205, 8 Sup. Ct. 273]; *In re Kemmler*, 136 U. S. 436 [34 L. Ed. 519, 10 Sup. Ct. 930]; *Crowley* v. *Christensen*, 137 U. S. 86 [34 L. Ed. 620, 11 Sup. Ct. 13]; *In re Converse*, 137 U. S. 624 [34 L. Ed. 796, 11 Sup. Ct. 191].''

■ It thus appears that it is thoroughly established that the right to contract, the right of the employer to hire labor and the right of the employee to sell his labor, is thoroughly protected by the federal and state Constitutions and may not be abridged except under the police powers of the state. These powers are restricted to those acts which promote the public health, safety, morals, and general welfare of the people. (*Miller* v. *Board of Public Works*, 195 Cal. 477 [234 Pac. 381, 38 A. L. R. 1479].) It remains for us to decide whether the prohibition of contracts such as we have here involved promote any such purposes. It would seem too obvious for argument that such contracts cannot affect either the public health, safety or morals. The matter of the general welfare may be a closer question.

The right to contract is a right included in the right to acquire and possess property and enjoy the freedom of action which is guaranteed by the fundamental law of our land. The right to labor and enjoy the fruits of toil is a right which is part of liberty itself guaranteeing to each man that he may sell his labor in an open market and upon the best terms he can obtain, subject only to the restriction that this right must not be exercised in such a manner that it conflicts with the public welfare or is injurious to the public health, safety, or morals. Speaking on this subject, Mr. Cooley in his Constitutional Limitations, said (p. 393): ''The man or the class

forbidden the acquisition or enjoyment of the property in the manner permitted the community at large would be deprived of liberty in particulars of primary importance to his or their pursuit of happiness."

Under the contract here in question, the wages became due when the money from the sales of lumber was received and in such amounts as could be paid from such receipts. We can see no way in which the general welfare of the people of the state or of any community of the state could be injured by permitting the partnership and its employees to enter into a contract of employment whereby the employees would be paid a fixed compensation for each hour of labor, to be paid out of proceeds derived from the sale of the product of that labor when and as fast as such proceeds were received by the employer.

It is stated that the partnership did not have sufficient funds with which to operate if regular bimonthly pay rolls had been maintained. This was disclosed to the employees so there was no concealment or fraud on the part of the employer and the contract was freely and voluntarily entered into and honestly carried out. Thus employment was furnished to several men who otherwise might have remained idle. This was a result greatly to be desired under the conditions prevailing during the early part of that year. Increasing employment was then a major objective of government as well as of industry. Anything that could honestly assist in accomplishing this purpose was strictly in accord with the public policy prevailing at that time. We cannot conceive how the contract in question could be regarded as being injurious to the general welfare. That being true the statute could not take away from the employer and employee the right to specially contract for labor and fix the time and manner of payment of wages.

The Supreme Court of Illinois had occasion to pass on a contract between an employer and employee which ran contrary to a statute which required certain corporations to pay their employees weekly. That case arose during the depression of the 1890's and owing to similar conditions prevailing then and in 1935 the reasoning is particularly applicable here. In the case of *Braceville Coal Co.* v. *People,* 147 Ill. 66 [35 N. E. 62, 37 Am. St. Rep. 206, 22 L. R. A. 340], the court said: "It is a matter of common knowledge

that a large number of manufactories were shut down because of the stringency of the money market. Employers of labor were unable to continue production for the reason that no sale could be found for the product. It was suggested in the interest of employers, as well as in the public interest, that employees consent to accept only so much of their wages as was actually necessary to their sustenance, reserving payment of the balance until business should revive, and thus enable the factories or workshops to be open and operated with less present expenditures of money. Public economists and leaders in the interest of labor suggested and advised this course. In this state, and under this law, no such contract could be made. The employee who sought to work for one of the corporations enumerated in the act would find himself incapable of contracting as all other laborers in the state might do. The corporations would be prohibited entering into such a contract, and, if they did so, the contract would be voidable at the will of the employee, and the employer subject to a penalty for making it. The employee would, therefore, be restricted from making such a contract as would insure to him support during the unsettled condition of affairs, and the residue of his wages when the product of his labor could be sold. They would, by the act, be practically under guardianship; their contracts voidable, as if they were minors; their right to freely contract for and to receive the benefit of their labor, as others might do, denied them.''

We are of the opinion that under the facts of this case, and the contract between the employer and employee, and in the absence of fraud, deceit or oppression, the employer was not required to maintain regular bimonthly pay days nor to post a notice for such pay days, and that the provisions of the Semi-monthly Pay Day Law are not applicable here. Counsel for petitioner earnestly argues that some of the provisions of that law are unconstitutional. Under the view we take of the case we are not required to decide those questions nor to proceed any further than we have gone in the decision of this case.

It is ordered that petitioner be discharged and his bail exonerated.

Barnard, P. J., and Jennings, J., concurred.