SANDS APPLIANCE SERVICES v WILSON

Docket No. 190270. Submitted April 2, 1997, at Detroit. Decided August 28, 1998, at 9:05 A.M. Leave to appeal sought.

Sands Appliance Services brought an action in the Sixteenth District Court against Christopher Wilson, seeking to recover the amount allegedly due under a "tuition contract" that the defendant had signed on becoming an employee of the plaintiff. The contract provided that in consideration of job training, the defendant would pay the plaintiff $50 a week during the three-year training period; however, the contract further provided that each week of continued employment beyond the training period would serve as payment for one week of the training period. Accordingly, if the defendant had worked for the plaintiff for six years, the cost of training would have been considered paid in full. When the defendant quit his employment after two and one-half years, the plaintiff invoked the provision of the tuition contract that provided that termination of employment made any unpaid tuition due in full and commenced its action to recover the $6,500 then owed by the defendant under the contract. At the close of plaintiff's proofs at a bench trial, the district court dismissed the case, finding that the tuition contract was illegal and void under the provisions of subsection 8(1) of the wages and fringe benefits act, MCL 408.478(1); MSA 17.277(8)(1). The plaintiff appealed to the Wayne Circuit Court, which affirmed, Michael J. Callahan, J. The plaintiff appealed to the Court of Appeals by leave granted. The Court of Appeals issued an opinion; however, before publication of the opinion, the Court granted the defendant's motion for rehearing and vacated its prior opinion.

On rehearing, the Court of Appeals *held*:

1. The plaintiff's claim that the defendant should have been precluded from relying on subsection 8(1) as an affirmative defense by reason of failing to plead the statute before trial was waived by its rejection of the trial court's offer of additional time to meet that affirmative defense and by its failure to show any prejudice arising from the defendant's failure to assert the statutory defense earlier.

2. Because of the absence of any legislative history concerning subsection 8(1), the Legislature's purpose must be determined from a reasonable construction of the language of the statute itself.

3. Because both subsection 8(1) and the corresponding administrative rule, 1982 AACS, R 408.9011, speak in terms of an employer demanding or receiving from an employee remuneration or consideration as a condition of employment or continuation of employment, it is questionable whether subsection 8(1) is applicable to the present arrangement in which the defendant's liability for payment arises upon the termination of his employment.

4. Even if the payment pursuant to the tuition contract is considered to be a condition of employment or of continuation of employment, there is nothing in the statute to suggest that employers may not enter into contracts with their employees in which the employees agree to pay or to reimburse their employers for valuable services provided to the employees by the employers. Here the plaintiff agreed to provide training in exchange for the defendant's promise to pay for that training either by continuing his employment for a three-year period beyond the end of the training period or by payment of any unpaid balance upon termination of employment. Neither public policy nor subsection 8(1) justifies the district court's refusal to enforce the provisions of the tuition contract as written.

5. Any inequality in the bargaining power of these parties at the time they entered into the tuition contract is insufficient to support a finding that the tuition contract was an adhesion contract.

Reversed and remanded.

BANDSTRA, J., dissenting, stated that the broad language of subsection 8(1) evidences a legislative intent that the prohibition should apply to any occasion where an employee must, in any fashion, make payment for the privilege of employment. Because the contract in this case required the defendant to incur a debt that was payable to the plaintiff, the statute applies and the contract was void and unenforceable.

CONTRACTS — EMPLOYMENT CONTRACTS — PAYMENT AS CONSIDERATION FOR EMPLOYMENT.

The provision of the wages and fringe benefits act that prohibits an employer from demanding or receiving any remuneration or consideration as a condition of employment or continuation of employment does not prohibit a contract in which an employee agrees to pay the employer for training supplied by the employer if the employee terminates employment before the end of a period set forth in the contract (MCL 408.478[1]; MSA 17.277[8][1]).

*Thomas H. O'Connor,* for the plaintiff.

*Dean Koulouras (John Lydick,* of Counsel), for the defendant.

Before: MARKEY, P.J., and BANDSTRA and HOEKSTRA, JJ.

MARKEY, P.J. In this breach of contract action, plaintiff, Sands Appliance Services, appeals by leave granted from an October 1995 circuit court order affirming a June 1995 district court order directing a verdict in favor of defendant Christopher Wilson. On appeal, plaintiff raises two issues: (1) whether defendant waived his contract defenses by failing to specifically plead them in his answer, and (2) if not, whether the parties' "tuition contract" was valid and enforceable. We reverse and remand.

Plaintiff, a Michigan corporation engaged in the business of major appliance repair, hired defendant as an appliance repair person in May 1992. When defendant, then nineteen years old and inexperienced, applied for a job with plaintiff, he and plaintiff's representative reviewed a document entitled "tuition contract," which provided that "in consideration for job training," defendant would pay plaintiff $50 a week over a three-year "training" period. Each week of continued employment after the training period would constitute payment for one week of training. Thus, if defendant remained employed with plaintiff for a total of six years, he would owe plaintiff nothing, and no money would actually change hands. In essence, plaintiff would "forgive" any indebtedness incurred for training. If the employment relationship terminated "for any reason," however, "the tuition payments owed at that time" were to be paid in full.

Defendant signed the tuition contract, and plaintiff hired him the same day. At the beginning of his employment, defendant earned $7 an hour. Defendant stopped working for plaintiff in November 1994, after two and one-half years of employment, and his earnings had escalated to an average of approximately $975 a week. Consequently, plaintiff made deductions from defendant's final two paychecks for tools, missing uniforms, and personal telephone calls, and applied the balance toward defendant's contract amount now due and owing. Plaintiff's president and sole stockholder, Ralph Parry, testified that in addition to paying defendant the agreed-upon wages, he provided defendant with six formal training sessions, constant instruction by Parry or other more experienced technicians, and study books and review questions to advance his training and to prepare him for the federal Environmental Protection Agency examination. Parry further allowed access to a videotape library and books and intensive in-shop instruction sessions. There was also testimony that plaintiff sent defendant with other service technicians on service calls, thereby requiring plaintiff to pay two employees to do one job, and that those service calls typically took longer because the defendant was receiving instruction. Parry testified that this training cost him "ten times" the $50 a week payments agreed to under the contract. While defendant was employed with plaintiff, he was never required to make any weekly payments under the contract.

At the close of plaintiff's proofs, the district court dismissed plaintiff's claim against defendant on the basis that the tuition contract was void and illegal as a "bond" and "debenture of $6,500." The circuit court

affirmed the district court's dismissal, finding that the district court had not abused its discretion in permitting defendant to raise certain defenses without enumerating the statutory provisions underlying the defenses and in concluding that the contract contravened MCL 408.478(1);    MSA 17.277(8)(1).    We disagree.

Defendant's designation of his motion in the district court as a motion for a directed verdict was a misnomer; the motion was really a motion for involuntary dismissal, a motion utilized in a bench trial when the court is satisfied after the presentation of the plaintiff's evidence that "on the facts and the law the plaintiff has shown no right to relief." MCR 2.504(B)(2); *Samuel B Begola Services, Inc v Wild Bros*, 210 Mich App 636, 639; 534 NW2d 217 (1995); *Armoudlian v Zadeh*, 116 Mich App 659, 671-672; 323 NW2d 502 (1982). We will review de novo the dismissal decision and the accompanying question of law involving statutory interpretation. See *First of America Bank v Thompson*, 217 Mich App 581, 583; 552 NW2d 516 (1996).

With respect to plaintiff's assertion that defendant should have been precluded from asserting the statute as an affirmative defense, we believe that plaintiff has waived this issue by rejecting the trial court's offer of additional time to research MCL 408.478(1); MSA 17.277(8)(1),   which was not specified in the affirmative defenses, and by failing to show prejudice. See *Phillips v Deihm*, 213 Mich App 389, 393-394; 541 NW2d 566 (1995).

Concerning the district court's interpretation of MCL 408.478(1);    MSA 17.277(8)(1),   we believe that plaintiff's tuition contract is neither void nor voidable

pursuant to the statute. When reviewing statutes, our primary goal is to ascertain and give effect to the Legislature's intent, and the Legislature is presumed to have intended the meaning it plainly expressed. *Farrington v Total Petroleum, Inc*, 442 Mich 201, 212; 501 NW2d 76 (1993); *McCready v Hoffius*, 222 Mich App 210, 214-215; 564 NW2d 493 (1997); *VanGessel v Lakewood Public Schools*, 220 Mich App 37, 40-41; 558 NW2d 248 (1996). The rules of statutory construction merely guide us in determining intent with a greater degree of certainty. *Nolan v Dep't of Licensing & Regulation*, 151 Mich App 641, 648; 391 NW2d 424 (1986). Judicial construction is appropriate only where reasonable minds can differ concerning the meaning of a statute. Judicial construction is neither necessary nor permitted where the plain and ordinary meaning of a statute is clear. *VanGessel, supra; Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996). We must look to the object of the statute and to the harm that it was designed to remedy and apply a reasonable construction aided by common sense in order to accomplish the Legislature's purpose. *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 644; 513 NW2d 799 (1994); *VanGessel, supra* at 41.

The statute at issue, subsection 8(1) of the wages and fringe benefits act, MCL 408.478(1); MSA 17.277(8)(1), provides:

> An employer, agent or representative of an employer, or other person having authority from the employer to hire, employ, or direct the services of other persons in the employment of the employer shall not demand or receive, directly or indirectly from an employee, a fee, gift, tip, gratuity, or other remuneration or consideration, as a condi-

tion of employment or continuation of employment. This subsection does not apply to fees collected by an employment agency licensed under the laws of this state.

The accompanying administrative rule, 1982 AACS, R 408.9011, which addresses "[r]emuneration as condition of employment," reads in pertinent part:

(1) An employer or representative of an employer shall not demand or receive, directly or indirectly, from an employee, any of the following as a condition of hire or continuation of employment:

(a) Fees, gifts, tips, or gratuities.

(b) Security deposits.

(c) Bonds to ensure that the employee completes the employment period.

(d) Uniforms required by the employer as specified in subrule (2) of this rule.

(e) Equipment required by employer as specified in subrule (3) of this rule.

(f) Other forms of remuneration or considerations.

\*   \*   \*

(4) This rule does not apply to fees collected by an employment agency licensed under Michigan law.

Plaintiff argues, without citation to authority, that subsection 8(1) and the administrative rule were intended to prevent employers from extorting money from employees by "selling jobs" during the Great Depression. Defendant is also unable to offer any authority regarding the origins of or rationale behind subsection 8(1). Moreover, plaintiff denies that the tuition contract involved any of the specified enumerated items under subsection 8(1) and instead contends that the purpose of the contract was to allow plaintiff to recoup a small portion of the money

expended to train and educate certain employees should the employment relationship terminate prematurely. Defendant counters that the tuition contract is the equivalent of indentured servitude and constitutes a bond under the administrative rules.

Michigan courts have long recognized the presumption that a contract has a legal purpose. *Stillman v Goldfarb*, 172 Mich App 231, 239; 431 NW2d 247 (1988). A contract will not be deemed illegal where it is capable of a construction that will uphold and validate it. *Id.* Where a contract is open to construction, the court must determine, if possible, the parties' true intent by considering the contract language, its subject matter, and the circumstances surrounding its making. *Id.* Hence, we must begin with the presumption that the parties' tuition contract was legal and strive to construe it as valid. *Id.* We bear in mind, however, that "the liberty of contract guaranteed by the constitution is freedom from arbitrary restraint,— not immunity from reasonable regulation to safeguard the public interest." *Miller v Wilson*, 236 US 373, 380; 35 S Ct 342; 59 L Ed 628 (1915).

Our review of the limited statutory history underlying subsection 8(1) provides little, if any, guidance.[1] We note, however, that California had a very similar statute. In *Henning v Industrial Welfare Comm*, 46 Cal 3d 1262; 762 P2d 442 (1988), the California Supreme Court reviewed the history of Cal Labor Code § 351 to determine whether a two-tiered mini-

---

[1] This section was formerly 1929 CL 8497 and 8498, which dealt with discrimination between sexes in the payment of wages in manufacturing jobs. These provisions were repealed by 1931 PA 328, § 567. 1978 PA 390, which led to the current version of subsection 8(1), also provides no insight with regard to the rationale behind this statutory enactment, and we can find no legislative analysis for this public act.

mum wage system for employees who receive tips was barred under the statute. In 1917, the California Legislature enacted the following statute that was the original source of § 351:

> *Any employer* or agent or representative of an employer
> . . . *who shall demand or receive directly or indirectly
> from any person then in the employment of said employer,
> any fee, gift or other remuneration or consideration,* or
> any part or portion of any tips or gratuities received by
> such employee while in the employment of said employer,
> *in consideration or as a condition of such employment or
> hiring* or employing any person to perform such services
> for such employer or of permitting said person to continue
> in such employment, is guilty of a misdemeanor. [1917 Cal
> Stat, ch 172, § 1, p 257(emphasis added).]

The *Henning* court observed that in *In re Farb,* 178 Cal 592; 174 P 320 (1918), it had struck down the 1917 statute "as violative of principles of 'substantive due process,' specifically 'freedom of contract.'" *Henning, supra* at 1270. After the *Farb* decision, in apparent response, the California Legislature in 1929 enacted a subsequent statute. The 1929 amendment of California's § 351 deleted the language that mirrors our subsection 8(1), i.e., the "demand or receipt" of "remuneration or consideration," "as a condition of such employment," and redrafted the language so as to address only the treatment of tips and gratuities that employees receive and to disallow employers from obtaining the benefit of employees' tips. *Henning, supra* at 1270-1275.

Our subsection 8(1) appears to address the same concerns expressed by the California Legislature in California's § 351, a nearly identically worded statute. This conclusion is buttressed by the language of an

obscure and virtually never invoked Michigan crimi-
nal statute, § 351 of the Michigan's Penal Code, MCL
750.351; MSA 28.583,[2] which is also identical to the
original civil statute struck down in *Farb*. Our § 351
reads as follows:

> *Any employer* or agent or representative of an employer or
> other person having authority from his employer to hire,
> employ, or direct the services of other persons in the
> employment of said employer, *who shall demand or receive*
> directly or indirectly from any person when in the employ-
> ment of said employer, any fee, gift or other remuneration
> or consideration, or any part or portion of any *tips or gra-
> tuities received by such employe* [sic] while in the employ-
> ment of said employer, in consideration or as a condition of
> such employment or hiring or employing person to perform
> such services for such employer or of permitting said per-
> son to continue in such employment is guilty of a
> misdemeanor.
>
> Nothing contained in this section shall be construed to
> apply to employment agencies or employment agents
> licensed and operating under the laws of this state. [Empha-
> sis added.]

After reading both Michigan statutes, § 351 and sub-
section 8(1), and considering their legal and factual
histories, it is apparent that these criminal and civil
statutes address the same concern as that addressed
by the California Legislature in California's § 351: tip-
ping practices. California case law and the evolution
of its § 351 provide some insight and guidance for us
as we look at our similar statutes, which have no illu-
minating histories.

---

[2] Our § 351 appears to be an obscure penal statute that has rarely, if
ever, been invoked, inasmuch as we can find no reported cases discussing
this provision.

Initially, we can find no support for plaintiff's theory concerning the genesis of this statute. Although plausible, it is, in any event, archaic. In fact, our subsection 8(1) originated with 1978 PA 390, promulgated approximately fifty years after the 1929 stock market crash. Because we have no accurate historical rationale for subsection 8(1), we are left with the task of reading and interpreting it. At this juncture, we must apply a reasonable construction, aided by common sense, in order to accomplish the Legislature's purpose. *Marquis, supra; VanGessel, supra.*

The statute prohibits an employer from demanding or receiving from an employee any "remuneration or consideration, as a condition of employment or continuation of employment." 1982 AACS, R 408.9011(c) and (f) prohibit the demand or receipt from an employee of any "[b]onds to ensure that the employee completes the employment period" or "forms of remuneration or consideration" as a condition of hire or continuation of employment. Even assuming, arguendo, that the reimbursement plaintiff seeks pursuant to the tuition contract constitutes "remuneration or consideration" or a "bond" to ensure employment, query whether a condition of employment or of continued employment is truly at issue here. In other words, we do not believe the contract at issue even runs afoul of the plain wording of the statute.

It is patent that this contract has nothing to do with tips or gratuities, accordingly we seriously question whether the Legislature intended that subsection 8(1) have an affect on or contemplated that subsection 8(1) would apply to this type of factual situation. In fact, this lawsuit was instituted to enforce the terms of a tuition contract and collect from an ex-employee.

By its very terms, the contract could not be sustained against either a prospective or current employee.

Defendant's contention that plaintiff's admission that it would not have hired defendant had he not signed the employment contract in and of itself constitutes a violation of subsection 8(1) ignores the plain reading of the statute. The situation in this case, in fact, constitutes the exact *opposite* situation contemplated in subsection 8(1). It is critical to emphasize that under the terms of the contract, defendant paid nothing and plaintiff demanded nothing, either at the inception or during the term of defendant's employment. Plaintiff received certain rights when it and defendant signed the contract, but none of those rights were enforceable during the tenure of defendant's employment. Although signing the contract may have been required of this particular defendant before he would be hired, the terms of the contract would come into play only upon his premature departure from the company. The facts of this case are very specific and strongly support the fact that each of the parties to this contract understood its terms and willingly entered into it. Plaintiff agreed to train defendant, and defendant agreed that he would reimburse plaintiff in small part the cost of that training were he to leave its employ before six year's time. Plaintiff testified that not all prospective employees were told about the tuition contract before they were hired, only those who required training before they could become productive.

Were we to conclude that the contract right plaintiff received is a condition of employment, then nothing distinguishes this contract right from any other agreed-upon contract right that inures to the benefit

of an employer. For example, although an employer may pay a company's telephone bills, it may require its employees to reimburse it for their personal calls. Provisions like this are usually included in employee handbooks that employees receive when they are hired, and new employees typically sign receipts acknowledging that they have received, read, understood and, in some cases, agree to abide by the policies set forth in the manual. Agreeing to the terms of these employee manuals can certainly be considered either a "condition of employment" or "continuation of employment."

We can find no justifiable means for distinguishing an employer's contractual right under certain conditions to receive a repayment of the cost of intensive on-the-job instruction that is given to an untrained, new employee from an employer's contractual right to receive reimbursement for an employee's personal telephone calls. Thus, were we to find that any contract right demanded by an employer of its employee constitutes "remuneration or compensation consideration as a condition of employment," it then could be argued in nearly all instances that employment contracts are void under subsection 8(1). We will not apply an interpretation that renders the statute a nullity or its application ludicrous.

Nor do the facts of this specific case support an argument that plaintiff demanded *indirectly* any of the prohibited fees, gifts, tips, or other items set forth either in subsection 8(1) or in the administrative rule. The fact is, plaintiff paid defendant fairly at the beginning of his employment and handsomely at its end, so it cannot even be asserted that defendant was "indi-

rectly" paying plaintiff by accepting a less than prevailing wage.

If the tuition contract's terms required defendant to repay plaintiff $50 a week for three years beginning the fourth year of employment from his paycheck, i.e., if plaintiff were to "dock" defendant's check, that would constitute an indirect means of paying a "fee," "security deposit," or "bond." Here, to the contrary, plaintiff specifically agreed simultaneously to forgive any repayment for training and to pay defendant a substantial salary for each week of continued employment beyond three years.

Moreover, we find no public policy against allowing a prematurely departing employee to agree to partially reimburse an employer for specialized training, without which an employee could not have performed his job—exactly the nature of the training that defendant received in the instant case. We liken plaintiff's agreement to provide defendant with the knowledge he needed to perform his job to an agreement to provide him with the tools requisite for the job. For example, without the necessary tools, including wrenches, wires, voltage meters, and so forth, defendant would be unable to repair appliances. So, if instead plaintiff had agreed to sell defendant the *tools* he needed to fix appliances, and defendant agreed to repay the employer if he were to leave his job and wanted to take the tools with him, we would find no reason to void such an arrangement, i.e., the employment contract, under subsection 8(1). In other words, defendant was free to accept plaintiff's offer, knowing that his early departure would result in financial obligations. Applying this example to the current context, the "tools" that plaintiff provided defendant were the

requisite training and knowledge that defendant needed to perform his job. Alternatively, defendant could have paid tuition to a community college or other learning institution to obtain the necessary skills to repair appliances. Thus, the training that defendant received has real value. Defendant's tools permit him to perform his job. Moreover, certainly defendant was aware of and willing to enter into the agreement he signed. No one forced or coerced his assent, and he was certainly free to seek employment elsewhere were he unhappy with plaintiff's terms.

Thus, neither sound public policy nor subsection 8(1) requires us to ignore the parties' rights to make and enforce contracts specific to their needs and circumstances. In short, without the training that defendant received during his interrupted apprenticeship with plaintiff, he would have been unable to earn a good living repairing appliances unless he had paid tuition to acquire the same skills at a community college or training center or had located another appliance shop willing to train him, either at a reduced rate of pay or at its own expense. Without training, defendant lacked the necessary skills, the "tools," needed to perform this job and pursue his current livelihood as an appliance repair person.

Finally, we disagree that the tuition contract was an adhesion contract. *Rehmann, Robson & Co v McMahan*, 187 Mich App 36, 43-44; 466 NW2d 325 (1991). To determine whether a contract is one of adhesion, we must determine the relative bargaining power of the parties, their relative economic strength, and the alternative sources of supply. *Id.* at 43. Reasonableness is the primary consideration in deciding whether a contract clause is enforceable. *Id.* at 44.

We find that because (a) plaintiff discussed the tuition contract with defendant before hiring defendant, (b) defendant was employed by another appliance store at the time he applied with plaintiff, and (c) defendant could have merely refused to leave his current job and go to work for plaintiff if he objected to the tuition contract, defendant had options available to him when presented with the tuition contract. Also, any inequality of options or bargaining power between plaintiff and defendant is insufficient to declare the tuition contract adhesive. Because the contract was substantively reasonable for the reasons set forth herein, it may be enforced. *Id.*

Plaintiff's employment training program does not violate MCL 395.101; MSA 15.627(1), which requires a proprietary school to secure a license. Plaintiff obviously falls outside the definition of a proprietary school and is instead "[a] school maintained or a program conducted, without profit, by a person for that person's employees." MCL 395.101a(c)(iii); MSA 15.627(1a)(c)(iii). As indicated earlier, Parry, the principal of plaintiff, testified that Sands Appliance generates no profit from this schooling and, in fact, calculated that the education costs plaintiff approximately ten times what the tuition contract obligated defendant to pay in the event he prematurely terminated his employment. Additionally, the testimony indicated that plaintiff suffers further loss with hiring inexperienced people, because employees in training, such as defendant, accompanied experienced technicians on calls. Plaintiff would, of course, be paying two employees, and the trainee would understandably slow down the experienced employee.

Accordingly, upon our review de novo, and on the basis of the specific unique facts of this case, we are compelled to reverse the district court's and the circuit court's determinations that plaintiff's tuition contract is unenforceable and void under the provisions of subsection 8(1) and 1982 AACS, R 408.9011.

Reversed and remanded for further proceedings consistent with this opinion.

HOEKSTRA, J., concurred.

BANDSTRA, J. (*dissenting*). I would affirm.

The broad statutory language at issue (an employer "shall not demand or receive, directly or indirectly, . . . a fee, gift, tip, gratuity, or other remuneration or consideration . . . ") evidences a legislative intent that the prohibition should apply to any occasion where an employee must, in any fashion, make payment or provide some sort of consideration to an employer for the privilege of employment. In this case, under the terms of the "tuition contract" he signed, defendant became indebted to plaintiff as a result of his employment. He had to make a $50 payment to plaintiff for each week he was employed or, alternatively, provide a benefit to plaintiff by continuing to work an additional three years beyond the three-year "training" period. In consideration of defendant's promise to this effect, plaintiff hired him; if defendant would not have so promised, he would not have been hired. The statute clearly applies, and the lower courts correctly decided that the tuition contract was unenforceable and void.

While I might agree with the majority that this is a bad policy result in today's labor market, I think it is required by the language of the statute. Moreover, I

find the majority's reliance on California precedents construing a provision of the California Labor Code to be inapposite. There is nothing to indicate that the Michigan Legislature considered the California statute or its interpretation by the California courts when enacting subsection 8(1) of the Michigan statute, MCL 408.478(1); MSA 17.277(8)(1). Further, if we somehow assume that we should interpret the clear language of the Michigan statute on the basis of the California statute and its history, we would be led to a result directly contrary to that reached by the majority. As the majority summarizes the history of the California statute,[1] *ante* at 412-413, it was broadly enacted in 1917 to apply to "other remuneration or consideration" received by an employee as well as "tips or gratuities." In 1918, a California court was presented with an argument not raised in this case and, consequently, ruled that this broad application was "violative of principles of 'substantive due process,' specifically 'freedom of contract' ". *Id.* As a result, in 1929, the statute was amended to delete the "remuneration or consideration" language and "was redrafted to only address the treatment of tips and gratuities." *Id.*

In contrast, when the Michigan Legislature first enacted the statute at issue here some forty years later, in 1970, it did so including the "other remuneration or consideration" language. This language has not been removed by legislative action in the ensuing almost thirty years. This legislative history evidences

---

[1] In the motion for rehearing, defendant argues the majority has incorrectly summarized this history. Even assuming this claim is meritless, the history of the California statute adduced by the majority does not support its conclusion regarding the Michigan statute.

an apparent rejection of the constitutional concerns raised by the California courts.

In any event, the broad language of subsection 8(1) remains intact. I see no reason to "seriously question whether the Legislature intended" that subsection 8(1) should have application only to a "tips or gratuities" agreement. *Ante* at 415.