Hancock, Jr., J.
(dissenting). This appeal presents a clear-cut legal question: whether plaintiff’s status as an officer, director, substantial part owner and active participant in the affairs and management of Glamore Motor Sales, a close corporation, gives him equitable rights and remedies which are not subject to the ordinary legal rules of master and servant? The majority answers "no” and writes off the case as a routine application of New York’s employment at-will rule. Because this produces a result which is egregiously unfair and one which, I am convinced, is not warranted under existing case law, I respectfully dissent.
By treating the essence of plaintiff’s complaints as a claimed breach of a hiring contract by the employer rather than an unfair squeeze-out of a minority shareholder in a close corporation by the majority, the court simply concludes that plaintiff has no rights at all. It does so by applying the rule of *191 Martin v New York Life Ins. Co. (148 NY 117), "that where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason [emphasis added]” (Murphy v American Home Prods. Corp., 58 NY2d 293, 300; see, Sabetay v Sterling Drug, 69 NY2d 329, 333; Weiner v McGraw-Hill, Inc., 57 NY2d 458). These cases, in my view, are totally inapposite. But in reliance on Martin, Weiner, Murphy and Sabetay, plaintiffs complaints are dismissed in their entirety, without a trial, on motions for summary judgment and dismissal (CPLR 3212, 3211 [a] [7]).
It is not disputed that plaintiff had, since joining the corporation in 1966, been a joint principal and codealer with defendant James Glamore in the Ford agency; was, for most of his association with the corporation, an owner of 40% of its shares and, at the time of termination, an owner of 25%; was, when terminated, a director, first vice-president and secretary of the corporation; and was, throughout his association, an active participant in the direction and management of the corporation as one of two codealers who obligated himself personally for corporate indebtedness. Nevertheless, the majority of the court holds that the corporation may, with impunity, terminate plaintiff as a director, officer and employee; it may do so because there is no employment contract between plaintiff and the corporation and the hiring is, therefore, presumptively at will; and it may do so, the majority holds, solely for the purpose of enabling the controlling stockholders to exercise their option to purchase plaintiff’s 25% stock interest at $2,400 per share, and for no other reason.
The majority’s decision summarily rejects, without discussion, plaintiff’s underlying theory which is rooted in his equitable rights as a minority shareholder and principal in a close corporation and the fiduciary duty of fair dealing owed him by the majority shareholders — rights and duties which have been widely recognized in statutory and decisional law in this and other jurisdictions (see, e.g., Matter of Pace Photographers [Rosen], 71 NY2d 737, 745-747; Matter of Kemp & Beatley [Gardstein] 64 NY2d 63, 69-73; Wilkes v Springside Nursing Home, 370 Mass 842, 353 NE2d 657 [1976], and cases and authorities cited in part II, infra).
Moreover, in dismissing the causes of action against the individual defendants for wrongfully inducing the corporation to terminate plaintiff as officer, director and employee, the *192 majority, in my opinion, disregards established precedent (see, e.g., Guard-Life Corp. v Parker Hardware Mfg. Corp., 50 NY2d 183, 194; A. S. Rampell, Inc. v Hyster Co., 3 NY2d 369, 375, 377; Federal Waste Paper Corp. v Garment Center Capitol, 268 App Div 230, affd 294 NY 714; see also, Minda, The Common Law of Employment At-Will in New York: The Paralysis of Nineteenth Century Doctrine, 36 Syracuse L Rev 939, 954-963).
What is remarkable about the majority opinion is that it appears to treat the employment at-will rule as a sort of categorical imperative which necessarily dictates the result in this case. There can be no question about the harshness of the outcome — assuming plaintiffs allegations to be true: the controlling shareholders are permitted to have the corporation fire plaintiff arbitrarily and in bad faith solely for the purpose of getting rid of him as a 25% stock owner.[1] Nevertheless, the decision that the case is governed by Sabetay, Murphy, Weiner and Martin is reached almost perfunctorily, without addressing the reasons underlying the rule’s application in this case, the good to come of it, or how it can be applied fairly. The sole justification seems to be in the rule itself; that its application is dictated by established law. In my opinion, the law clearly does not require it; nor should it.
I
An understanding of the case requires some discussion of the facts. Plaintiff’s claim is that the majority shareholders— *193 in violation of their fiduciary duty owed to him, a minority shareholder — have caused Glamore Motor Sales to terminate him unlawfully from his positions as officer, director and employee of the corporation. This they have done, he maintains, for their personal gain and solely to effectuate the buyback provision so as to eliminate him as a stockholder. Plaintiff’s claim, very simply, is one of an abuse of corporate power by the majority resulting in an unlawful squeeze-out of a minority shareholder.
Many of the facts giving rise to plaintiff’s claim are historical and matters of record: e.g., that plaintiff owned 22% of the stock of Glamore Motor Sales in 1966, 40% in 1973 and 25% in 1983 when he was terminated; that he became a codealer of the Ford agency in 1966 with James H. Glamore, the majority shareholder, under an agreement with Ford in which Glamore Motor Sales acknowledges that plaintiff "substantially participate^] in the ownership” of the corporation and that plaintiff, along with James H. Glamore, has "full managerial authority and responsibility for the operating management” of the dealership; that in 1966 he became an officer (first vice-president and secretary) and a director of the corporation and remained in these positions until terminated in 1983; that throughout his association with the corporation plaintiff was active in the management and daily operations of the business and personally guaranteed bank loans (maintained at a level between $750,000 and $1,000,000) made in connection with the agency’s car and truck inventories; that, in addition to his investment of $75,000 for purchase of his stock shares, plaintiff, from time to time, made advances of his own personal funds when the business was in need of working capital; that at a special , meeting of the board of directors on May 9, 1983, over plaintiff’s objection, he was removed as an officer of the corporation and in his place William Glamore and Robert Glamore, sons of James H. Glamore, were elected vice-president and secretary-treasurer, respectively; and that, thereafter, upon exercise of the purchase option in the shareholders’ agreement, plaintiff was compelled to deliver his shares for the sum of $2,400 per share. About these facts there is no dispute.
In his verified complaints, his affidavits opposing defendants’ motions, and his deposition, plaintiff alleges that he became sales manager of Glamore Motor Sales in 1964 and later a co-owner of the business as a means of achieving his objective of becoming a franchised Ford dealer in the Long Island area; *194 that from 1966 until 1982 he ran the business, supervising, and hiring and firing the employees and making the day-today. business decisions; that by terminating him from his position at Glamore Motor Sales at the age of 61 and forcing him out of the business through exercise of the purchase option, the majority not only deprived him of his continued employment and salary as an executive, director, and manager of the business, but denied him "the opportunity to realize some profit on [his] investment” and precluded him "from all the benefits and equities [he] had built up through years of devotion and dedication to the business”; and that he would never have made the sacrifices and investments of time, effort and money in the business had he known that the buyback provision would be interpreted to make him subject to summary firing at the whim of the co-owner. For the purpose of this appeal, of course, these latter allegations must be read in the light most favorable to the plaintiff consistent with the rule that in opposing motions to dismiss for failure to state a cause of action and motions for summary judgment the plaintiff’s submissions must be accepted as true (see, e.g., Myers v Fir Cab Corp., 64 NY2d 806; Rovello v Orofino Realty Co., 40 NY2d 633; Sillman v Twentieth-Century Fox Film Corp., 3 NY2d 395, 404).
The Appellate Division, in dismissing plaintiff’s complaints, and the majority of the court, in its affirmance, have adopted defendants’ literal interpretation of the phrase in paragraph 7 (b) of the stockholders’ agreement — "cease to be an employee of the Corporation for any reason” — as giving defendants the unfettered right to repurchase plaintiff’s shares by firing him, even if arbitrarily or in bad faith.
The plain wording of the buy-back provision and its sense, when read in the context of the entire agreement and the circumstances surrounding its execution, by no means unequivocally support this interpretation. Plaintiff states that the purpose and intent of paragraph 7 (b) was to protect James Glamore in case plaintiff chose to leave the business, not to give Glamore the right — at any time, for any reason or for no reason — to deprive plaintiff of all expectancies as coprincipal in the agency. He points to the other two contingencies giving Glamore the right to repurchase his shares: plaintiff’s decision to sell his stock (para 7 [a]) and plaintiff’s death (para 7 [c]); he argues that the purpose of paragraph 7 (b) like that of the other provisions was solely to protect Glamore by giving him the right to repurchase upon the *195 happening of a contingency beyond Glamore’s control — i.e., in paragraph 7 (b), plaintiffs voluntary decision to leave. The very choice of the wording to describe the contingency of plaintiffs leaving — i.e., "ceases to be an employee” rather than "is terminated” — tends to support plaintiffs argument. The word "ceases” suggests that it was action by plaintiff not by the employer in ending the relationship which was contemplated. Thus, in my opinion the repurchase option of 7 (b) is not free from ambiguity.
The circumstances under which the option was signed, including the fact that plaintiff was not represented by counsel when he executed the agreement, and plaintiff’s sworn statements that the agreement was not intended to authorize James Glamore to terminate the business relationship on a whim without cause in order to force a buy out of his interest, I believe, present factual issues requiring a trial and a denial of the dismissal and summary judgment motions. The majority, however, rejects this view. Thus, we proceed to the central legal question: whether, assuming defendants’ literal interpretation of the repurchase option to be correct, they may cause the corporation to discharge plaintiff as an officer, director and managerial employee solely for the purpose of triggering the option and forcing him out as a part owner.
Preliminarily, it must be emphasized that the phrase "cease to be an employee of the Corporation for any reason” appears only in the stockholders’ agreement and pertains exclusively to the conditions under which the majority may exercise its right to repurchase plaintiff’s stock. Contrary to what the majority claims the agreement "expressly confirms” (see, majority opn, at 190), this contractual provision clearly says nothing about the conditions under which the corporation may terminate plaintiff’s employment.
There is no employment agreement between plaintiff and the corporation. Nothing in the original stockholders’ agreement between plaintiff and James Glamore or in the subsequent agreement between plaintiff and the additional members of the Glamore family as stockholders purports to set the terms of plaintiffs relationship with the corporation or to state when or under what circumstances it may be terminated. Thus, Bevilacque v Ford Motor Co. (125 AD2d 516), Coleman v Taub (638 F2d 628) and Jenkins v Haworth, Inc. (572 F Supp 591), cited by the majority (majority opn, at 190), are not in point, since they involve employment contracts in which the stockholder-employee expressly agreed with the *196 corporate employer that the hiring was at will.[2] Upholding the corporation’s right to discharge plaintiff here, therefore, must rest squarely on the application of the employment at-will doctrine, "that where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason” (Murphy v American Home Prods. Corp., 58 NY2d, supra, at 300). Whether this rule may be properly and fairly applied in this case is the central issue on which we disagree.
II
New York, like many other States, unquestionably recognizes that the status of a minority shareholder in a close corporation requires special protection from the courts. Indeed, in Matter of Kemp & Beatley (Gardstein) (64 NY2d 63, 71), Chief Judge Cooke, speaking for a unanimous court stated: " 'Unlike the typical shareholder in a publicly held corporation, who may be simply an investor or a speculator and cares nothing for the responsibilities of management, the shareholder in a close corporation is a co-owner of the business and wants the privileges and powers that go with ownership. His participation in that particular corporation is often his principal or sole source of income. As a matter of fact, providing employment for himself may have been the principal reason why he participated in organizing the corporation. He may or may not anticipate an ultimate profit from the sale of his interest, but he normally draws very little from the corporation as dividends. In his capacity as an officer or employee of the corporation, he looks to his salary for the principal return on his capital investment, because earnings of a close corporation, as is well known, are distributed in *197 major part in salaries, bonuses and retirement benefits’ (O’Neal, Close Corporations [2d ed], § 1.07)” (see, Fender v Prescott, 101 AD2d 418, 421, 424; Matter of Ronan Paint Corp., 98 AD2d 413; Matter of Gordon & Weiss [Weiss — Gordon], 32 AD2d 279, 281; Matter of Topper v Park Sheraton Pharmacy, 107 Misc 2d 25, 32-34; Matter of Pivott Punch & Die Corp., 15 Misc 2d 713, 715-717 [Sup Ct, Erie County, Jasen, J.]; see also, Wilkes v Springside Nursing Home, 370 Mass 842, 353 NE2d 657 [1976], supra; Hallaban v Haltom Corp., 7 Mass App 68, 385 NE2d 1033 [1979]; Notzke v Art Gallery, 84 111 App 3d 294, 405 NE2d 839 [1980]; Exadaktilos v Cinnaminson Realty Co., 167 NJ Super 141, 400 A2d 554).
Thus, for purposes of asserting rights as a minority shareholder under Business Corporation Law § 1104-a, we have held that a shareholder "who reasonably expected that ownership in the corporation would entitle him or her to a job, a share of corporate earnings, a place in corporate management, or some other form of security, would be oppressed in a very real sense when others in the corporation seek to defeat those expectations and there exists no effective means of salvaging the investment” (Matter of Kemp & Beatley [Gardstein], supra, at 72-73).
The singular vulnerability of the minority in a close corporation has prompted courts of equity to impose fiduciary obligations on the majority shareholders in their dealings with the minority and to require "a high degree of fidelity and good faith” (Fender v Prescott, supra, at 422). This same need for protection from the majority is reflected in the "solicitude toward the rights of minority shareholders” (Matter of Kemp & Beatley [Gardstein], supra, at 70) shown by our Legislature in enacting Business Corporation Law §§ 1104-a, 1118 (see, Matter of Pace Photographers [Rosen], 71 NY2d 737, 744-745, supra) and by Legislatures in other jurisdictions in enacting similar statutes (see, Kendrick, The Strict Good Faith Standard-Fiduciary Duties to Minority Shareholders in Close Corporations, 33 Mercer L Rev 595, 599-600; O’Neal, Close Corporations: Existing Legislation and Recommended Reform, 33 Bus Lawyer 873, 880-888; 1 O’Neal & Thompson, Oppression of Minority Shareholders [2d ed] §§ 1:03, 3:02 ["Squeeze techniques in general”]; § 3:05 ["Remedies of the squeeze”]; § 3:06 ["Eliminating minority shareholders from directorate and excluding them from company employment”]; 1 O’Neal & Thompson, Close Corporations § 1.07, at 25-27 [3d ed]; After-man, Statutory Protection for Oppressed Minority Sharehold *198 ers: A Model for Reform, 55 Va L Rev 1043). The need for special protection of a minority shareholder could not be better illustrated than in the case at bar.
A person who, like plaintiff, buys a minority interest in a close corporation does so not only in the hope of enjoying an increase in value of his stake in the business but for the assurance of employment in the business in a managerial position. In addition to the security of long-term employment and the prospect of financial return in the form of salary, his expectancy includes a voice in the management and operation of the business and in the formulation of its plans for future development and growth (see, e.g., Matter of Kemp & Beatley [Gardstein], supra, at 71-72). The anticipated rewards for his efforts differ markedly from those of the typical salaried corporate employee in a large company (see, e.g., Sabetay v Sterling Drug, supra; Murphy v American Home Prods. Corp., supra) and encompass much more than the promised salary or other immediate remuneration: e.g., the prospect of participating in the growth and the increased value of the business, and the challenge, the independence, the prestige, the feeling of achievement, and the other intangible benefits of being part of the management of a successfully run small company (see, e.g., 1 O’Neal & Thompson, Close Corporations § 1.07; 1 O’Neal & Thompson, Oppression of Minority Shareholders § 3:06).
Not surprisingly, the losses which a minority shareholder in a close corporation may suffer in a squeeze-out by the majority have been characterized as "catastrophic” (1 O’Neal & Thompson, Oppression of Minority Shareholders § 1:03). It is because of the difficulty in valuing these expectancies and the inadequacy of an action at law for damages as a remedy for their loss and the fact that the majority may inflict such losses on a minority shareholder through the sheer exercise of voting power, that resort to equitable remedies is necessary (see, e.g., Matter of Kemp & Beatley [Gardstein] supra, at 69-70; Wilkes v Springside Nursing Home, 353 NE2d, supra, at 662, 664; Donahue v Rodd Electrotype Co., 367 Mass 578, 328 NE2d 505, 512-518 [1975]; Exadaktilos v Cinnaminson Realty Co., 400 A2d, supra, at 559-562; and see, 1 O’Neal & Thompson, Oppression of Minority Shareholders § 3:06 [2d ed]).[3]
*199 Thus, the relationship of a minority shareholder to a close corporation, if fairly viewed, cannot possibly be equated with an ordinary hiring and, in the absence of a contract, regarded as nothing more than an employment at will. But this is exactly how the majority of the court has treated plaintiiFs association with Glamore Motor Sales. And it has done so by not addressing the multiple relationships and the expectancies and vulnerabilities peculiar to the status of a minority shareholder in plaintiiFs position — those very considerations which call for the relief that only a court of equity can give. By simply considering the case as one at law for breach of contract, the majority makes defendants impervious to suit by placing them under the protective mantel of the Sabetay, Murphy, Weiner and Martin rule. This result, I submit, is not only unfair but amounts to an extension of the employment at-will doctrine over a situation which, I believe, it was never intended to cover.
Ill
Assuming for the moment that the case could properly be viewed merely as one at law for breach of a hiring contract, the application of the employment at-will rule in this context would still be particularly inappropriate and unfair. Nor is such application supported by our precedents.
There can be little question that the basis for the traditional employment at-will rule is in the contractual principle of mutuality of obligation, "that if the employee can quit his job at will, then so, too, must the employer have the right to terminate the relationship for any reason or no reason” (Blades, Employment At Will vs. Individual Freedom on Limiting the Abusive Exercise of Employer Power, 67 Colum L Rev 1404, 1419; Minda, The Common Law of Employment At-Will in New York: The Paralysis of Nineteenth Century Doctrine, 36 Syracuse L Rev 939, 975-978). Indeed, the Supreme Court, in Adair v United States (208 US 161), stated the general rule thus: "the right of the employee to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employee” (208 US, supra, at 174-175).[4]
To be sure, this court in recent years has shied away from *200 the "mutuality” doctrine in favor of the doctrine of contractual consideration as the basis (see, Weiner v McGraw-Hill, Inc., supra, at 463-464) for its "sharply scrutinized” employment at-will rule (see, Sabetay v Sterling Drug, 69 NY2d 329, 333, supra; Murphy v American Home Prods. Corp., supra, at 308-309, and n 4 [Meyer, J., dissenting in part]). Nevertheless, in adhering to the principle that "the law accords the employer an unfettered right to terminate the employment at any time” (see, Murphy v American Home Prods. Corp., supra, at 304), rejecting the tort of abusive discharge (id., at 300-301), and declining to read into an indefinite employment contract an implied obligation of fair dealing (id., at 304, 305), the decisions have done so in recognition of the continued vitality of "the freedom of contract underpinnings of the [employment at-will] rule” (id., at 301). And it has been observed that any modification of the rule should be left to the Legislature, because "stability and predictability in contractual affairs is a highly desirable jurisprudential value” (Sabetay v Sterling Drug, supra, at 336). Thus — despite recent pronouncements (see, e.g., Weiner v McGraw-Hill, Inc., supra, at 463) — there clearly remains at the core of the employment at-will rule at least a hard residue of the mutuality notion — the idea, simply, that if the employee can quit at any time for any reason he can be discharged at any time for any reason.
But whether it be lack of mutuality or lack of consideration, the rationale for the employment at-will rule does not fit the situation of the typical minority shareholder-participant in a close corporation. For such participant is not truly free to quit at any time; and there is consideration which would support an implied understanding that, at least, the majority owner will not discharge him arbitrarily or in bad faith and without some legitimate business reason. Unlike the employee of a *201 large corporation, the minority shareholder in a close corporation has typically invested a large percentage of his financial wherewithal in the business. He has been willing to do so because of what he expects will be his long-term association with the business and his ability to protect his investment and, he hopes, to make it grow. The same features of the minority owner-participant’s status which make him particularly vulnerable to action by the majority obviously work to compel him to stay on the job. He needs to do so to protect his investment and to share in any increase in its value.
In short, there are strong financial and other pressures operating to prevent a minority shareholder from deciding to leave voluntarily. To treat plaintiffs position in Glamore Motor Sales as though it entailed the same freedom to leave as that of the large company mid-level employees in Murphy, Weiner and Sabetay is to ignore the substantially different factors in plaintiffs situation which curtailed his freedom to leave and which, as a practical matter, bound him to the job. Thus, application of the employment at-will rule in this case would, I submit, be clearly inconsistent with its "freedom of contract underpinnings” (Murphy v American Home Prods. Corp., supra, at 301), whether those "underpinnings” are lack of mutual promises or want of consideration.
IV
In concluding that plaintiff has no basis for a claim against the individual defendants for interference with plaintiffs employment by unlawfully inducing the corporation to discharge him, the majority reasons that to allow him to recast his claim "in the garb of a tortious interference” would permit him to "evade the employment at-will rule and relationship” (majority opn, at 189). This court has long held, however, that a cause of action for tortious interference with contract may exist even where the underlying contract is terminable at will (see, Guard-Life Corp. v Parker Hardware Mfg. Corp., 50 NY2d 183, supra; A. S. Rampell, Inc. v Hyster Co., 3 NY2d 369, supra). Although interference with a terminable at-will contract, like interference with a prospective contract, requires proof that wrongful means were used (see, Guard-Life Corp. v Parker Hardware Mfg. Corp., supra, at 190-191), such wrongful means include "violation of a duty of fidelity owed to the plaintiff by the defendant” (id., at 194, citing A. S. Rampell, *202 Inc. v Hyster Co., supra;[5] and Duane Jones Co. v Burke, 306 NY 172; see, Federal Waste Paper Corp. v Garment Center Capitol, 268 App Div 230, 234, affd 294 NY 714, supra; Minda, The Common Law of Employment At-Will in New York: The Paralysis of Nineteenth Century Doctrine, 36 Syracuse L Rev 939, 978-981 [and cases cited therein]). Here it is alleged that the individual defendants, as majority shareholders, acted in violation of their fiduciary duty to plaintiff as a minority shareholder. Thus, even if it is assumed that plaintiff’s relationship with Glamore Motor Sales amounted to no more than a legal hiring at will, his causes of action against the individual defendants for inducing his discharge willfully and in bad faith for the purpose of triggering the buy-back provision should not have been dismissed.
V
In sum, I believe that plaintiff has valid claims arising out of his discharge in bad faith by the controlling shareholders in violation of their fiduciary duty owed to him as a minority shareholder in a close corporation. Also, plaintiff has valid claims against the individual defendants for wrongfully inducing the corporation to terminate his employment. The record demonstrates clearly that there are factual issues requiring that plaintiff be given the opportunity to prove these claims at trial. The order should, therefore, be reversed, the motions denied, and plaintiff’s complaints reinstated.
Chief Judge Wachtler and Judges Simons, Alexander and Titone concur with Judge Bellacosa; Judge Hancock, Jr., dissents and votes to reverse in a separate opinion in which Judge Kaye concurs.
Order affirmed, with costs.

. The notion that plaintiffs loss must somehow be viewed as less onerous because he is not contesting the $2,400 per share cash-out price (see, majority opn, at 189) misses the point of the lawsuit. Plaintiff wants to keep his stock — not to sell it. The injury to plaintiff is that he is being involuntarily cashed out as a stockholder through the buy-back agreement and forced out of his investment and participation in Glamore Motor Sales, Inc. Obviously, if the buy-back agreement is held to be enforceable against plaintiff, he is precluded from complaining about the amount. He has agreed to it.
Moreover, it cannot seriously be suggested that plaintiff should be pleased with being repaid a total of $96,000 in 1983 for his $75,000 cash outlay made 17 to 15 years earlier, particularly in light of the high risk he assumed in guaranteeing the corporation’s loans up to $1,000,000. That he agreed to such buy-back figure, of course, supports his contention that he thought the buy-back agreement was intended to protect Glamore’s control over plaintiff’s stock by giving Glamore the right to repurchase the stock in the event that plaintiff died, wished to sell or transfer his shares, or voluntarily decided to quit; and that it was never in plaintiff’s contemplation that the clause was to apply as the price for his shares in the event that he was involuntarily terminated (see, point I, at 194-195, infra).

. Coleman v Taub (638 F2d 628) involved the claim of plaintiff, a 1% stockholder employee, that the majority stockholders, in violation of their fiduciary duty under Delaware law, forced through a "freeze-out” merger for the sole purpose of getting rid of plaintiff as a stockholder. Despite the specific language in plaintiff’s employment contract, giving the corporation the right to "buy-back” his stock upon "termination of [his] employment * ** * for any reason whatsoever” and the corporation’s claim that plaintiff had by agreeing to this provision, bargained away his right to complain about the merger, the court found triable issues of fact and declined to grant summary judgment to the corporation. Plaintiff’s additional claim— analogous to the claim of plaintiff here — that the corporation had unlawfully terminated his employment for the sole purpose of effectuating the buyback remained unresolved and not addressed in the decision.

. Professor O’Neal refers to the device allegedly improperly employed by the majority here — discharging the minority shareholder as employee for the purpose of triggering the buy-out option — as one of the methods used to eliminate a minority shareholder as an owner of the business (see, 1 O’Neal & Thompson, Oppression of Minority Shareholders § 3:06, at 37 [2d ed]).

. In Adair v United States (208 US 161), a Lochner-era decision (see, Lochner v New York, 198 US 45), the Supreme Court struck down a statute making it a Federal offense to fire a worker because of his union member *200 ship upon the ground that the statute interfered with the employer’s constitutional substantive due process and contractual rights to discharge an at-will employee at any time for any reason. Professor Blades cites Adair, the first case in which the Supreme Court addressed the employment at-will rule, as illustrative of the traditional basis for the rule in the common law of contracts (see, Blades, Employment At Will vs. Individual Freedom on Limiting the Abusive Exercise of Employer Power, 67 Colum L Rev 1404, 1416-1417, 1419-1421). Commenting on the freedom of contract underpinnings of the employment at-will rule, Justice Holmes, in dissent, stated: "I confess that I think that the right to make contracts at will that has been derived from the word liberty in the amendments has been stretched to its extreme by the decisions; but they agree that sometimes the right may be restrained” (208 US, at 191).

. In A. S. Rampell, Inc. v Hyster Co. (3 NY2d 369), plaintiff distributor sued one of its suppliers (Hyster), the supplier’s district manager (Shaffer), and one its own salesmen (Chester) for tortious interference with contracts. The contracts in question — a dealer-manufacturer relationship between plaintiff and Hyster and several employment contracts between plaintiff and its salespeople — were all terminable at will (3 NY2d, at 374). The court held that there could be tortious interference with these at-will contracts if, as was asserted, the interferers owed the plaintiff a duty of trust or confidence (3 NY2d, at 376-377 [see, discussion and cases cited]).